LAWRENCE R. HOLT, STATUTORY ADMINISTRA-
TOR FOR THE ESTATE OF ELLEN YUK LIN
YIN ALSO KNOWN AS ELLEN YUK CHOY YIN,
DECEASED *v.* ACME MATTRESS COMPANY
AND LONDON GUARANTEE AND ACCIDENT
COMPANY, LIMITED.

NO. 2962.

ARGUED DECEMBER 3, 1953.    DECIDED JANUARY 14, 1955.

TOWSE, C. J., LE BARON AND STAINBACK, JJ.

OPINION OF THE COURT BY TOWSE, C. J.

This is an appeal from a judgment of the circuit court denying a claim for workmen's compensation filed by the statutory administrator of the estate of Mrs. Ellen Yuk Lin Yin, deceased, under the provisions of Chapter 77 of the Revised Laws of Hawaii 1945, as amended. The claim was based upon death resulting from a cerebral hemorrhage alleged to have constituted an accidental injury

arising out of and in the course of decedent's employment with the Acme Mattress Company.

An award granted by the director of the bureau of workmen's compensation was affirmed by the labor and industrial relations appeal board, but was reversed by the circuit court after a trial *de novo,* jury waived. Appellant now seeks by writ of error to reverse the judgment of the circuit court.

The material facts developed below were that the Acme Mattress Company and its predecessor in business employed the decedent for approximately ten years, first as a seamstress and thereafter as a cloth cutter. Her duties as a cutter consisted of cutting slip and mattress covers by use of a circular electric knife and "feeding" the cut material to six other employees who performed various sewing operations. While standing, the decedent was required to cut the pieces of cloth to size as they hung suspended from a rack, the cloth having theretofore been unrolled from bolts of rolled material varying in weight from 35 to 70 pounds suspended from the racks. It was the duty of designated male employees to lift the heavier bolts of rolled material onto a measuring table where the cloth was unrolled and placed upon the racks in preparation for the cutting operation performed by the decedent.

At approximately 6:00 p.m. on September 25, 1951, the decedent complained to her sister, who was also employed at the factory, of being tired and dizzy. She thereupon stopped work and instead of returning home for dinner as was her custom, she requested her sister to accompany her to a restaurant where they dined. The decedent then returned home at approximately 7:00 p. m. and retired early, remarking to her daughter with whom she resided, that "she was feeling rather tired that night." At 2:00 a. m. she awoke complaining of "feeling uncomfortable" and "numb." At 4:00 a. m. her daughter summoned the dece-

dent's physician, who on arrival, found her unconscious, and ordered her transferred to a hospital. The decedent received hospitalization treatment for cerebral hemorrhage, and within a month recovered sufficiently to be discharged. She returned home and thereafter received weekly treatment from her physician until July 10, 1952, when she suddenly succumbed. Her physician testified at trial that death was caused by the cerebral hemorrhage. The record does not indicate that an autopsy was performed. Upon the decedent's medical history her physician testified that he first treated her in April of 1943 for hypertension which "fluctuated from normal up to moderate high." About that time, he testified that he had inspected the factory of the appellee company, and in view of the nature of her work and her then physical condition had advised her to "lighten up on her job" by reducing her working day from eight to five hours. He treated the decedent approximately once a month thereafter from 1943 until February, 1951, during which time her blood pressure continued to fluctuate. From February, 1951, to September 26, 1951, he did not attend her until summoned on the morning of her hemorrhage.

While the foregoing facts were uncontroverted at trial, issue was taken first, as to whether in the course of her employment the decedent had ever lifted any of the heavy bolts of rolled material from the floor of the factory onto the measuring table, and second, if she had not, whether any other incidents of her employment had aggravated her preexisting condition of hypertension in such a degree as to be considered the cause of the fatal cerebral hemorrhage.

Upon the first issue the evidence is in conflict. Two coemployees of the decedent testified that they had observed her lift heavy bolts of material from the floor onto the measuring table at various times during her employment. This was contradicted by the shop foreman and one

of the partners of the appellee company, both of whom testified that the male employees only were required to perform that particular task. By the foreman: "* * * the women folks are not supposed to lift that heavy stuff at all. They are told not to." By the partner: "Actually I stress if there is anything that is heavy, have the men lift it for her. Of course, there was some light bolts that they can very well lift themselves, but I have always stressed that if there was anything heavy that she wasn't able to lift, or even if it would be a little too heavy, to have the men lift it." Both witnesses testified that they had never seen the decedent perform any heavy lifting operations such as is claimed. It was not established that the decedent had in fact lifted any bolted material at any time during the work day of September 25, 1951, at which time the first symptoms of the hemorrhage appeared.

The trial judge found that there had been "no showing that her unconsciousness of September 25th was brought on by lifting a heavy bolt of fabric. The evidence is that the lifting of the heavy full bolts were handled by men or by other women assisting the claimant, and that the lifting of such heavy bolts was not part of the duties of the claimant."

Upon the second issue of reasonable causation between the conditions of employment and the injury sustained, the evidence consisted in part of decedent's employment record for the period April, 1951, to September 25, 1951. It reflected that decedent's employment during that period consisted of a normal schedule of forty-eight hours per week including an average of 3.9 hours of overtime per week. While orders and contractural obligations of the appellee company required such overtime operations in order to meet delivery commitments, the evidence established that all overtime in excess of forty hours per week was optional and voluntary on the part of the employees.

During her last period of employment the decedent's daily work schedule consisted of: Friday, September 21, eight hours; Saturday, September 22, five hours; Sunday, September 23, day off; Monday, September 24, ten hours; Tuesday, September 25, ten hours. Except for limited testimony that decedent sometimes commented that she was "tired," and "overtime tired" and that she rested during lunch periods for fifteen or twenty minutes, no evidence was presented establishing or indicating that prior to the occurrence of the first symptoms of her stroke on September 25, 1951 that decedent appeared other than physically normal. It was, however, established that at no time prior to that date had the decedent ever commented or complained to either members of her family, friends, or her employer, that her overtime work or any other incident of her employment had caused her to suffer any serious ill effects.

Additional evidence bearing upon the issue of causation consisted of portions of the testimony of the decedent's physician:

"A. Well, I believe in her case that the work she did definitely aggravated her existing condition of hypertension.

"THE COURT: Wouldn't that be true in any employment, doctor, a woman who was suffering from hypertension in her age group? Wouldn't that have been true of any type of employment?

"THE WITNESS: It would be true of any type of employment if she had a pre-existing hypertension.

"Q. You mean any type of employment?

"A. Any type of full-day employment.

* * *

"Q. How about the type of her employment, the way she worked at this Acme Mattress Company?

"A. I believe that her work definitely aggravated and precipitated the hemorrhage of the brain."

Upon cross-examination the physician testified that high blood pressure is "definitely a disease — in a number of people in middle age," and that the real cause of cerebral hemorrhage is not the heart but "the blood vessels themselves * * * The friability of the walls of the blood vessels." To the following question he responded affirmatively: "And if a person could escape that disease, they would escape the results you have described here?"

Upon this issue the trial judge found in part:

"The Court finds that the death of the employee herein was not the result of an accident which arises out of and in the course of her employment, and finds that the evidence fails to establish an unusual strain suffered by claimant prior to her heart seizure * * *" and that there was insufficient evidence to establish that decedent's "unconsciousness of September 25th was brought on by lifting a heavy bolt of fabric."

Plaintiff-in-error now contends:

"1. That said decision, order, and judgment of the trial court are contrary to the law and the evidence in that the stroke followed by death was not an accidental occurrence arising out of the course of employment under section 4403 of the Revised Laws of Hawaii, 1945.

"2. That the court erred in denying claimant's recovery under the Workmen's Compensation Act in that the nature of the employment was 'rush' work during the months of August and September of 1951 and the overtime required in her work during these two months, were not contributory factors in causing the stroke on September 25, 1951, followed by paralysis and death."

It is the settled law in this jurisdiction that: "To warrant compensation under the Workmen's Compensation Act it must appear that the workmen personally

received injury (1) by accident (2) arising out of and (3) in the course of his employment. *All of these essential elements must co-exist at the time of the accident. The absence of any one defeats compensation."* (*Wong Chee* v. *Yee Wo Chan,* 26 Haw. 785, 791, 792; underscoring added.)

We deem it necessary to determine but one issue, viz: whether in the circumstances presented, the cerebral hemorrhage constituted an injury arising out of decedent's employment.

"* * * for an accident to arise out of employment there must be reasonably apparent a causal connection between the conditions under which the work is required to be performed and the resulting injury, that is, the injury must reasonably appear to have flowed from that source as a rational consequence thereof." (*Honda* v. *Higa,* 33 Haw. 576, 578.) "The burden of proof rests upon the applicant to establish all the facts necessary to entitle him to compensation under the Workmen's Compensation Act. Factors necessary to support the claim cannot be left to surmise, conjecture, guess or speculation. Nor will proof of facts equally consistent with a right to compensation and with the absence of such right be sufficient." (*Wong Chee* v. *Yee Wo Chan, supra,* 794.)

In workmen's compensation cases, where an appeal is taken by an employer from the findings of an appellate board to the circuit court, the statute contemplates a trial *de novo.* (R. L. H. 1945, § 4443; *Ching Hon Yet* v. *See Sang Co.,* 24 Haw. 731, 736.) And, where as here, on writ of error from the findings and decision of a circuit judge, jury waived "* * * the evidence is conflicting findings which have for their support evidence more than a mere scintilla, that is, evidence of a character sufficiently substantial as to warrant the court as trier of the facts, in view of all the circumstances of the case, in finding from it the fact to establish which the evidence was introduced

* * * will not be disturbed." (*Hewahewa* v. *Lalakea*, 27 Haw. 544, 553.)

The evidence upon the issue of whether the decedent had ever lifted heavy bolts of cloth prior to her stroke was grossly conflicting. Although certain testimony tended to disclose that decedent had on occasions lifted heavy bolts, there was also evidence establishing that performing heavy lifting was not a part of her duties, work of that nature being the duty of male employees. Moreover, there was no evidence establishing that the decedent lifted any heavy bolts on September 25, 1951, the day of her stroke. In these circumstances we find that there is evidence amounting to substantially more than a scintilla to support the trial judge's findings upon this issue. We concur in those findings.

Plaintiff-in-error contends that evidence other than the foregoing established that the decedent's injury constituted an accident within the meaning of the statute, i. e., that she had worked an average of approximately four hours per week overtime for the preceding five and one half months; that on the two days preceding her stroke she had worked overtime two hours each day; that the nature of this particular overtime work was "rush" work; and that the attending physician testified that he believed "her work definitely aggravated and precipitated the hemorrhage of the brain."

Upon the foregoing contention, plaintiff-in-error argues that the following rule is determinative: that to constitute an "accident" within the meaning of the Workmen's Compensation Act a claimant need only establish that either the cause of the injury was accidental in character or that the effect suffered by him was the unforeseen result of performance of his routine duties; and therefore, if the strain of claimant's normal and usual exertions in fact caused a collapse from cerebral hemorrhage, heart

weakness, hernia, or the like, he may recover compensation. Defendant-in-error, on the other hand, asserts that to entitle a claimant to compensation it must be established that the injury resulted from the performance of duties involving an unusual strain or exertion over and above the normal and usual exertion required of the duties involved.

Most of the precedent cited upon this issue involved circumstances wherein the claimant, for a prolonged period of time, was required to perform lifting operations of heavy objects onto a platform, and while so lifting an object of such usual size and weight he suddenly experienced a pain and collapsed shortly thereafter. Medical testimony in those cases established by way of causation, that the claimant had been previously suffering from arteriosclerosis or hypertension and that the strain of normal and usual exertion expended in the lifting precipitated a cerebral hemorrhage resulting in the collapse. (See *In re Zurich General Accident and Liability Insurance Co., Limited,* 175 App. Div. 224, 161 N. Y. S. 535; *Patrick* v. *J. B. Ham Co., et al.,* 119 Me. 510, 111 A. 912.) In jurisdictions recognizing the rule that unusual strain or exertion must be established, recovery will be denied in this factual situation; whereas in those jurisdictions requiring merely a showing of usual strain or exertion in order to constitute an "accident," recovery is allowed.

We are of the opinion that the sounder rule of the many discussed, is that asserted by plaintiff-in-error. (See Larson, *Workmen's Compensation Law,* Vol. I, p. 543 *et seq.*) However, the cases cited by plaintiff-in-error enunciating and applying the usual exertion test are inapplicable to the circumstances before us for the reason that they concern only the issue of whether or not the injuries for which compensation was sought constituted an "accident." The issue for determination in the present case is

not whether decedent's injury constituted an "accident," but whether or not her injury "arose out of her employment." "The basic current problem in this area, then, is not one of accidental character; it is the extremely difficult medico-legal question of causation." (Larson, *Workmen's Compensation Law,* Vol. I, p. 567.) "There must still be an unexpected result, and there must still be an exertion — some exertion — capable medically of causing the collapse. This can by no means be taken for granted. If heart failure overtakes the employee while he is merely waiting for a bus or an elevator [there is] simply * * * no strain at all to provide an accidental result of employment activity. The natural progress of the disease may bring it to its fatal climax during working hours, but if the employee's activity at the time involves no effort, or effort which cannot support medically a causal connection, it can rightly be said that the outcome was neither accidental nor causally related to the employment. It was not accidental simply because it did not happen by chance; it happened by the inexorable march of the disease." (Larson, *Workmen's Compensation Law,* Vol. I, pp. 565, 566.)

The case of *Walsh* v. *Diamond State Brewery,* 7 Ter. (Del.) 252, 82 A. (2d) 740, illustrates these principles and is applicable to the instant case. In that case the claimant, afflicted with a pre-existing condition of arteriosclerosis and hypertension, suffered a cerebral hemorrhage while shoveling coal into a boiler, this act being a part of his normal duties of employment as a night-engineer-watchman. Compensation was denied, the court expressing the view that it was not unmindful of the prevailing rule that to allow compensation it was not necessary to establish that the injury resulted from an unusual strain or exertion, it being sufficient if the injury occurred while he was "engaged in the performance of his

normal and usual work." (*Walsh* v. *Diamond State Brewery, supra,* 741.) However, recovery under the view expressed can be predicated only upon evidence establishing that the "alleged injury occurred at a fixed time and place and was attributable to a clearly traceable incident of employment, which was the sole cause of his injury, or a contributing cause thereto." (*Walsh* v. *Diamond State Brewery,* 7 Ter. [Del.] 252, 82 A. [2d] 740, 742.) The industrial accident board in the *Walsh* case found that the injury was "due entirely to the progressive nature of his pre-existing diseased condition and not as an incident of employment," and that finding was affirmed on appeal.

Similar circumstances were presented in the case of *Beck* v. *National Surety Corporation,* 171 F. (2d) 862 (C. C. A. 5), wherein the deceased, aged fifty, in the course of his normal duties disconnected a hose and closed a valve. Although the evidence was in conflict upon whether the decedent had strained himself in closing the valve, he gave no patent indications of having been injured in that operation, and within a few minutes thereafter had gone to the employees' dressing room to prepare to leave for the day, it being approximately 4:00 p. m. Prior to leaving, as was his custom, he consumed a bottle of beer with two fellow employees. At that time he appeared "well and happy" and "walked and talked in a normal manner." On returning home at approximately 4:45 p. m. the decedent commenced to suffer the preliminary symptoms of an apoplectic stroke. By 6:30 p. m. his left side had developed a complete paralysis and a short time thereafter he succumbed. Death was attributed to the cerebral hemorrhage. In sustaining a verdict denying compensation the court stated, in referring to the issue of causation: "There is absolutely no direct or substantial evidence in this case of any accidental injury sustained by the deceased while at work * * *. So far as the testimony in this record is

concerned, to assume that the deceased suffered an accidental injury while at work, is but to indulge in sheer speculation and conjecture. Although there is no dispute that he died as a result of the cerebral hemorrhage, it was shown that such hemorrhage may be caused by a variety of incidents, such as coughing, worry, anger, high blood pressure, and exertion, none of which factors were excluded here." (*Beck* v. *National Surety Corp.*, 171 F. [2d] 862, 864 [C. C. A. 5].)

That the decedent had been engaged in performing her *normal duties* including limited overtime work up to the time of the occurrence of the first symptoms of her cerebral hemorrhage on September 25, 1951, does not, in our opinion establish in the circumstances presented, a reasonable causal connection between the conditions of her employment and the injury. Although many cases including those relied upon by claimant, do not require evidence of unusual exertion or strain but only proof of such exertion or strain as may occur in the normal course of work, such minimum requirement does not eliminate the necessity of establishing a causal relationship between such exertion or strain and the injury. (*Walsh* v. *Diamond State Brewery*, 7 Ter. [Del.] 252, 82 A. [2d] 740; Larson, *Workmen's Compensation Law*, Vol. I, pp. 566, 567.) One of the vital issues in the circumstances before us is the medico-legal one of causation, and we find that there is more than a scintilla of substantial evidence supporting the decision of the trial judge upon that issue.

Decedent's normal duties as a cloth cutter consisted of cutting slip and mattress covers by the use of a circular electric knife and feeding the cut material to other employees who performed various sewing operations. She stood while performing these cutting operations upon the cloth as it hung from racks. For several months prior to the date of her stroke she had engaged in limited overtime

work, averaging 3.9 hours per week, and on two days preceding her collapse had put in two hours per day overtime. Although she occasionally complained of being tired, it was not made to appear that any aspect of her work caused her to suffer any serious ill effects. Nor does it appear that the overtime work was performed at an accelerated pace greater than that at which she normally performed her routine duties. Consequently, plaintiff-in-error's contention that her overtime work was "rush" work is without merit.

Reviewing the entire record upon this issue, it appears that decedent's duties were in fact comparatively light, and involved no factors which are commonly found to be the causes of cerebral hemorrhage. Those factors are described in Malloy, *Nervous and Mental. Diseases,* 1935 ed., p. 25:

"Causation. — High pressure within the arteries themselves, and weakness in some portion of the arterial walls are usually present in rupture of an artery. The small dilatations or sacs produced in an inflamed or diseased arterial wall are under great pressure from the strong heart action, and one or more of them breaks. Alcoholism, the poisons of lead and syphilis, gout, rheumatism, and the wear and tear produced by old age, are other causes of cerebral hemorrhage. * * * Physical strain, a sudden change in position, strong emotions, coughing, sneezing, laughter * * * vomiting, and straining at stool, are other causes which may result in a ruptured blood-vessel."

Additional evidence upon the issue of causation is found in the testimony of decedent's physician. Although he testified: "I believe that her work definitely aggravated and precipitated the hemorrhage of the brain." other portions of his testimony tended to refute this conclusion. On cross-examination he affirmed that hypertension "is

definitely a disease \* \* \* in a number of people in middle age"; that cerebral hemorrhage results from the "friability of the walls of the blood vessels" of the brain; and that if a "person could escape that disease, they would escape the results \* \* \* described here." He further testified that "any type of full-day employment" would aggravate a condition of pre-existing hypertension such as decedent's, but later added the qualification: "\* \* \* if she has any sort of mental tension connected with that work." We perceive contradiction and inconclusiveness in the foregoing testimony in such degree as to characterize it as bordering on speculation and conjecture. (*Wong Chee* v. *Yee Wo Chan,* 26 Haw. 785, 794.)

That the trial court refused to accord conclusive weight to this testimony as determinative of the issue of causation does not, in our opinion, constitute reversible error. "The credibility of all witnesses, including experts, and the weight to be given their testimony, is to be determined by the trier of facts, and the court is not bound to accept the opinion of experts as more than advisory, even though such testimony may be undisputed." (*Solomon* v. *Renstrom,* 150 F. [2d] 805, 808.) "The weight to be given purely opinion evidence is always a matter for the appraisal and judgment of the trial court or jury, in the light of all the circumstances of the particular situation." (*Hawkinson* v. *Johnson,* 122 F. [2d] 724, 731, 137 A. L. R. 420, cert. denied, 314 U. S. 694.)

Plaintiff-in-error contends that the Workmen's Compensation Act should be construed liberally so as to support an award in favor of the claimant. (*Wong Chee* v. *Yee Wo Chan,* 26 Haw. 785, 794.) We are reluctant to construe liberality as extending to injuries other than accidental injuries established to have arisen out of and in the course of employment. "\* \* \* the statute cannot be liberalized by judicial interpretation to allow noncompen-

sable claims." (*Nollett* v. *Holland Lumber Co.*, 141 Neb. 538, 4 N. W. [2d] 554, 556; *Burlage* v. *Lefebure Corp.*, 137 Neb. 671, 291 N. W. 100, 101.) "The workmen's compensation law is not designed as a complete substitute for life insurance, or sick and accident insurance, for employees, nor can sympathy be allowed to broaden [its] express statutory provisions * * * ." (*Luteran* v. *Ford Motor Co.*, 313 Mich. 487, 21 N. W. [2d] 825, 828.)

Judgment affirmed.

*W. Y. Char* (also on the briefs) for plaintiff in error.

*E. J. Botts* (also on the brief) for defendants in error.