## HAWAII BUILDERS SUPPLY CO., LTD. *v.* HARRY M. KANETA.

### No. 3062.

Argued April 23, 1957.          Decided September 20, 1957.

Rice, C. J., Stainback and Marumoto, JJ.

This is an appeal by plaintiff from a judgment of the circuit court in favor of defendant in a jury waived case for recovery of the price of lumber sold by plaintiff to defendant. In arriving at its decision the trial court sustained defendant's defense of novation. We are asked to reverse the judgment on the ground that the finding of the trial court on the question of novation is clearly erroneous.

Novation is defined in section 424 of the Restatement of Contracts as a contract that

"(a) discharges immediately a previous contractual duty or a duty to make compensation, and

"(b) creates a new contractual duty, and

"(c) includes as a party one who neither owed the previous duty nor was entitled to its performance."

Thus, a discharge of a previous contractual duty is one of the essential elements of a novation.

Plaintiff is a dealer in lumber and other building materials. In April 1951 and for some time prior thereto defendant was engaged in a packing and crating business under the name of Hawaiian Packing and Crating. In the operation of his business he established a favorable credit standing with plaintiff. In April 1951 defendant entered into a joint venture with one Jesse Jackson for the manufacture of pallets for finger lifts. Materials needed for the manufacture of pallets were purchased from plaintiff. Initially such purchases were made in the name of Hawaiian Packing and Crating and on defendant's credit. In May 1951 defendant and Jesse Jackson formed Standard Corporation, Ltd., which will hereafter be referred to as the corporation. However, purchases were continued to be made in the name of Hawaiian Packing and Crating, although payments were made by the corporation. On August 30, 1951, the debit balance of Hawaiian Packing and Crating with plaintiff was $12,332.95. On that day defendant requested plaintiff that such balance be transferred to the corporation. Plaintiff complied with such

request. It credited the account of Hawaiian Packing and Crating with the sum of $12,332.95, thereby leaving a balance of zero, and set up a new account in the name of the corporation.

Direct evidence is vague as to whether plaintiff released defendant from his obligation to pay the account when the account was transferred to the corporation. On this point, the trial court was of the view that the testimony of plaintiff's principal witness contradicted the testimony of defendant.

So, the trial court looked at the acts and dealings of the parties subsequent to the transfer of the account in order to determine the understanding between them.

It is undisputed that the following acts and dealings took place after the transfer of the account. The corporation made no further purchases from plaintiff but made several payments on the account. On January 22, 1952, the debit balance was $6,032.95. On that day, the corporation executed a promissory note in favor of plaintiff for the payment of such balance with interest at the rate of twelve per cent per year. The note was signed for the corporation by Jesse Jackson, as president, and defendant, as treasurer. The corporation made one payment of $500.00 on the note on May 23, 1952, leaving an unpaid balance on principal of $5,532.95. On November 17, 1952, plaintiff filed an action against the corporation on the note. On April 7, 1953, it obtained a judgment in the action. This judgment has not been set aside, modified or revised and remains in full force and effect. Plaintiff filed the instant action against defendant on July 22, 1953. After the transfer of the debit balance of $12,332.95 in the account of Hawaiian Packing and Crating to the corporation, plaintiff did not send any statement of account to defendant, either in his individual name or in the name of Hawaiian Packing and Crating, but sent all monthly statements to the corpora-

tion. After the transfer of the account and before the filing of the instant suit, plaintiff did not by any act indicate that it continued to look to defendant personally for payment.

On the basis of such subsequent acts and dealings, and particularly the institution of action by plaintiff against the corporation and the prosecution of the same to judgment, the trial court found that plaintiff unconditionally released defendant from personal liability and accepted the corporation as its new debtor.

It is our opinion that the record supports the finding of the trial court.

The consent of parties to a novation may be established by circumstances showing such assent as well as by expressed words. (39 Am. Jur. Novation § 26; 66 C. J. S. Novation § 26d; 6 Williston on Contracts, Rev. Ed., § 1875)

Subsequent conduct of the creditor may be taken into account in determining whether the release of the original debtor was intended, and, in this connection, it has been held that an intent to release the original debtor is shown by the creditor bringing an action against the new debtor. (*Walton* v. *Beauregard,* 1 Rob. (La.) 301; *Osborn* v. *Osborn,* 36 Mich. 48; *Manfre* v. *Sharp,* 210 Cal. 479, 292 Pac. 465; *Kenison* v. *Anderson,* 83 Mont. 430, 272 Pac. 679)

Plaintiff argues that if there was a novation in this case, it was conditional upon the payment of the debt and cites *Jan Ban* v. *Tsen Yim,* 15 Haw. 433. That case does not stand for any such proposition.

In *Jan Ban* v. *Tsen Yim,* Tsen Yim and three others, as partners, were indebted to plaintiff. Tsen Yim bought out the other partners, continued to operate the business, and gave his note to plaintiff for the debt. The question before the court was whether the mere giving of such note, without more, operated as a novation so as to extinguish

the original debt, as a matter of law. This court held that such act did not operate as a novation as a matter of law. It declined to state whether the trial court should have found that there was a novation as a matter of fact. It, however, stated: "Just how much evidence is required is a matter of some difference of opinion. Under the circumstances of this case probably comparatively slight evidence would be sufficient."

There may be a conditional novation. With respect to conditional novation, Williston states: "The only question involved is what the parties in fact agreed upon. Where the new agreement is conditional, it is possible that the parties agreed that on the happening of a condition there should be a novation, and that until and unless the condition happened, the original obligation should remain in force." (6 Williston on Contracts, Rev. Ed., § 1873) *Hata v. Dean Witter & Co.*, 32 Haw. 760, another case cited by plaintiff, is such a case. However, in the instant case there is no evidence indicating that a conditional novation was contemplated by the parties.

Plaintiff also cites section 8742 of the Revised Laws of Hawaii 1945 (R. L. H. 1955, § 192-2), which reads as follows: "A judgment against one or more of several obligors, or against one or more of joint, or of joint and several obligors shall not discharge a co-obligor who was not a party to the proceeding wherein the judgment was rendered." It argues that in view of this section defendant is not released from his obligation to plaintiff although plaintiff obtained a judgment against the corporation. The argument is based on the premise that defendant was an obligor on the same debt at the time that plaintiff obtained judgment against the corporation. The finding of the trial judge is that defendant was not such obligor. Thus, the section is not applicable in this case.

Section 52 (a) of Hawaii Rules of Civil Procedure provides that a finding of a trial court in a jury waived case "shall not be set aside unless clearly erroneous * * *." Plaintiff contends that the finding of the trial court that plaintiff released defendant from personal liability is clearly erroneous. It relies on *United States* v. *United States Gypsum Co.*, 333 U. S. 364, and, in particular, the following language of the court on page 395: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

Plaintiff argues that "In the instant case two reputable businessmen who were officers of the Plaintiff corporation testified in direct contradiction of the statement of the Defendant concerning the alleged release of individual liability, and we believe that this Court may well examine that testimony with the view of determining its credulity."

The two reputable businessmen referred to are Albert F. Hastings, president and manager of plaintiff corporation, and Eugene W. Neal, its secretary and treasurer.

With respect to what took place on August 30, 1951, when the account was transferred, Hastings testified on direct examination by plaintiff's counsel as follows: "Mr. Kaneta and Mr. Jackson came into our office, and came to my desk and said they would like to discuss this matter. I told him as far as I was concerned, I felt it would be all right but that it would be up to Mr. Neil [*sic*] who handled the credits and everything, to approve it and to work out the mechanics of the proposition with him. Mr. Neil's desk is, would be for instance like I'm facing his Honor now, he is right behind mine. A difference of about 4 feet, and they both sat down with Mr. Neil's desk. I didn't enter into the mechanics of the operation." On cross-examination by defendant's counsel he was asked: "As far as you are

concerned, you consented to the transfer and let Mr. Neil work out the details?" To this question, he answered: "That is what I have testified to, that they came and asked me. I told Mr. Neil because of Mr. Kaneta's record of paying us in the past, that if it could be worked out properly for him to do so, and I turned around this way and Mr. Neil's desk as I said is right behind and both he and Jackson sat down with Neil, and I went on with other business. I didn't enter into the actual mechanical part of the transaction. Now, whether Mr. Neil's assistant also entered into that, I couldn't testify. He might have, I mean that he is there in the office. It could be part of his work, but to the best of my knowledge it was done, the mechanical part of it with Mr. Neil."

Hastings' testimony with respect to the signing of the note by the corporation is as follows:

"Q Were you present at the time the promissory note was made in January of 1952?

"A I believe that I was.

"Q Tell us as near as you can recall what was said and done on that occasion?

"A I didn't enter into the actual signing of the note at all. That was taken care of by Mr. Neil. I don't recall myself that I entered into any part of the formal, of the conversation itself."

From the foregoing testimony, it cannot be said that Hastings testified in direct contradiction to defendant. Hastings had no conversation with defendant as to whether defendant would be released from personal liability. He left that matter entirely up to Neal.

Now, what is Neal's testimony? To a question by plaintiff's attorney as to whether anything was said about releasing defendant from his individual obligation to pay, Neal testified: "Oh, no. Mr. Kaneta was fully aware that he was responsible for the account. That was the granting

of credit was Mr. Kaneta because I told him in the beginning, at the time of the transfer I said, we just as soon let you off the hook, we all agree it is the same corporation, but only trying to segregate the accounts and it is pretty hard to enter our books until we get a complete segregation."

Plaintiff's counsel states in his brief that the phrase "we just as soon" in the above testimony is incorrect and what the witness actually said was "this doesn't." As the transcript was not corrected before it was presented to this court, we must look at what is in the transcript. It appears that the phrase as reported in the transcript fits the context more appropriately than the phrase which plaintiff's counsel attributes to the witness.

Earlier, on direct examination by plaintiff's counsel, Neal testified as follows:

"Q  Now, were you present on or about the 30th day of August, 1951, at which time a request was made to transfer the charge on your books to a concern known as Standard Corporation?

"A  I held the transaction.

"Q  You tell us as nearly as you can recall what transpired?

"A  Mr. Hastings called me and told me that Mr. Kaneta would like to have his account transferred to Standard Corporation and he and Mr. Jackson came over and my conversation was with Mr. Kaneta and not Mr. Jackson. And I asked him two or three questions. I asked him why, and he said, well, we are distinguishing the commercial accounts from the large accounts Standard is handling. The large contracts and Hawaii Packing and Crating will handle the normal commercial accounts. So I said, well, what about payment. He said, they're going to, well, he said, you'll

get your payments. I'll guarantee that. We have just prior to that some, I don't remember two months or a few months before that received a check against Hawaiian Packing from Standard Corporation and I believe that check came in the mail, that was one of the few checks that came in the mail. I asked Mr. Kaneta the next time I saw him who is Standard Corporation. He said, well, it's the same outfit.

"Q You remember anything else that was said in the course of this conversation on August 30th?

"A No, I did tell Mr. Kaneta I was looking to him for payment, and not Jackson.

"Q What, if any, representation did he make to that statement?

"A Oh, yes, he said that's understood. I'm treasurer of the corporation."

The following is Neal's testimony with respect to the signing of the note:

"Q Were you present on the occasion when a note was signed by Jackson and Kaneta?

"A I was.

"Q Tell the Judge what took place on that occasion?

"A Well, they said that they were in bad shape and Mr. Kaneta said that he wanted to show his good faith and that they would sign a note and so I said, well, whose note is it going to be, and he said, well, Standard Corporation, Mr. Jackson and myself would sign it. I told him, you know Jackson's name is no good. I'm still looking to you for payment of the account. He said, oh, that's understood.

"Q Was anything said about him signing a note himself?

"A When Mr. Jackson, he came in one time a few months later, I think, after the note was signed and

told me they were buying Jackson out, and he asked me if I wanted his personal note. I told him, 'Harry, your word is just as good as it always was with us.' "

In the foregoing testimony, Neal did not say in so many words that he released defendant from personal liability. However, it is not too far-fetched to say that such release is implied in the testimony. Before the transfer of the account, plaintiff had received a check of the corporation in payment of defendant's account. Neal asked defendant about the corporation the next time that he saw him. He got the reply that "it's the same outfit." So, what does Neal do? Here Neal's testimony may again be quoted: "* * * I told him in the beginning, at the time of the transfer I said, we just as soon let you off the hook, we agree it is the same corporation * * *." Nothing in Neal's testimony indicates an agreement to hold defendant personally liable for the account after its transfer. Neal states that when he asked defendant as to who would pay the account, defendant said, "I'll guarantee that." However, Neal took no step to make such guaranty, if any, effective. Neal told defendant that he was looking to the latter for payment, and not Jackson. To this defendant replied that that was understood, "I'm treasurer of the corporation." Defendant's reply was not that he would personally pay, but that as treasurer of the corporation he would see to it that the account was paid. Later in the course of the conversation with respect to the signing of the note, Neal asked defendant as to "whose note is it going to be," to which defendant replied, "Standard Corporation, Mr. Jackson and myself would sign it." Neal then told defendant that Jackson's name was no good and that he still was looking to defendant for the payment of the account. This statement must mean that Neal looked to defendant for the payment of the account as an officer of the corporation, and not individually, for defendant was not asked to endorse the

note. Neal had one final chance to make defendant personally liable. After defendant bought out Jackson, he asked Neal whether he wanted defendant's personal note. Neal told defendant, "Harry, your word is just as good as it always was with us."

What Neal's testimony reveals is that he had no faith in Jackson. He had implicit faith in defendant. As far as Neal was concerned, so long as defendant was in charge of the corporation, defendant and the corporation were one and the same and he just as soon let defendant personally "off the hook." He was confident in his own mind that regardless of whether defendant was personally liable or not the latter would see to it that the corporation paid the account. So, he found it unnecessary to take defendant's personal note when defendant offered to execute such note. This explains all of Neal's subsequent acts, which are explainable only on the basis that the corporation was substituted for defendant and that defendant was released from personal liability by such substitution.

On the record before this court, we cannot say that we are left with a definite and firm conviction that a mistake has been committed by the trial court.

Affirmed.

*William B. Cobb* (*Levinson & Cobb* on the briefs) for appellant.

*Valdemar H. Myhre* (*Samuel P. King* with him on the brief) for appellee.