JOHN S. DZURIK *v.* RICHARD I. TAMURA.

No. 4048.

June 29, 1960.

Tsukiyama, C. J., Marumoto, Cassidy, Wirtz and Lewis, JJ.

OPINION OF THE COURT BY LEWIS, J.

In an action tried without a jury, defendant-appellee was adjudged liable for the negligence of a minor, his son, who drove defendant's automobile into a Wahiawa Transport Company bus, injuring plaintiff-appellant, the bus driver.

Plaintiff was awarded $2500 and costs. His appeal asserts inadequacy of this sum. The reason why the judgment was not larger was that the court found against the plaintiff on the question stated by the court as follows:

"The question for this Court to decide is to determine whether the accident of August 23, 1953 caused the injury which ultimately necessitated surgery on January 19, 1955, or whether there was some intervening injury which resulted in the necessity for the operation."

The specifications of error assert in various forms that the court erred in making the following finding:

"* * * that the injury which caused the disability which ultimately necessitated in the operation of January 19, 1955, was not due to the automobile accident of August 23, 1953. That the injury resulting in said disability was due to some separate and distinct intervening cause."

The operation of January 19, 1955 was performed on plaintiff's spine. It was the fourth such operation. The other operations had been performed before the accident. Whether the defendant is liable for the decompensation of the spine necessitating this fourth operation is the point at issue.

The $2500 awarded was exclusive of claims based on the spinal condition, which was by far the greatest cause of pain and suffering, loss of work and medical expense.

The principles as to proximate causation, burden of proof and evaluation of medical testimony which are determinative here are as follows:

1. Though the negligence was shown, the causal connection between the negligent act and the injury complained of—here the decompensation of the spine which necessitated the operation of January 19, 1955—also must be shown. Proximate causation of an injury must be proved and is never presumed. *Jackson* v. *Colston,* 116 Utah 295, 209 P. 2d 566; *Bish* v. *Employers Liability Assurance Corp.,* 236 F. 2d 62; see also *Lyu* v. *Shinn,* 40 Haw. 198.

2. It being the fact that at the time of the accident the plaintiff was suffering from a physical defect the necessary causal connection may be supplied by proof that the accident activated or aggravated this condition. *Rideau* v. *Los Angeles Transit Lines,* 124 Cal. App. 2d 466, 268 P. 2d 772 (D.C.A. 2d Dist.); *Perry* v. *McLaughlin,* 212 Cal. 1, 297 Pac. 554; *Owen* v. *Dix,* 210 Ark. 562, 196 S.W. 2d 913; *Mourison* v. *Hansen,* 128 Conn. 62, 20 A. 2d 84; *Rainwater* v. *Timothy,* 87 So. 2d 11 (La. App.); *Nelson* v. *Twin City Motor Bus Co.,* 239 Minn. 276, 58 N.W. 2d 561; 15 Am. Jur., *Damages,* §§ 80, 81.

3. A case involving a medical issue, such as the present one, is no exception to the rule that, when there are conflicting inferences and conclusions, it is the function of the trier of facts to select the one which it considers most reasonable. *Yin* v. *Acme Mattress Co.,* 40 Haw. 660, 672, 674; *Awai* v. *Paschoal,* 43 Haw. 94, 97; *Fukuoka* v. *Dodo,* 43 Haw. 337, 340; *Sentilles* v. *Inter-Caribbean Corp.,* 361 U.S. 107; *Behles* v. *Chicago Transit Authority,* 346 Ill. App. 220, 104 N.E. 2d 635. However, when the trier of facts "would be required to speculate and guess on too many elements in the chain of causation" a verdict may be directed for the defendant. *Jackson* v. *Colston, supra.*

4. When causation of the injury is a medical issue, as it is here, "[the] matter does not turn on the use of a particular form of words by the physicians in giving their testimony," since it is for the trier of facts, not the medical witnesses, to make a legal determination of the question of causation. Hence, the failure of a medical witness to testify positively as to what was the cause of the injury, or his statement that the accident "might" be or "probably" was the cause of the injury, is merely a circumstance to be taken into consideration by the trier of facts. *Sentilles* v. *Inter-Caribbean Corp., supra; Fukuoka* v. *Dodo, supra; Dornell* v. *Retirement Board,* 72 Cal. App. 2d 197, 164 P. 2d 266 (D.C.A. 1st Dist.) distinguishing *Brant* v. *Retirement Board,* 57 Cal. App. 2d 721, 135 P. 2d 396 (D.C.A. 1st Dist.), on which plaintiff relies.

The accident occurred August 25, 1953. The day after, plaintiff was examined by Dr. John William Cooper, an orthopedic surgeon who had been treating him for low back injury since June 18, 1948, at which time Dr. Cooper had ascertained that plaintiff had a separation of the last lumbar vertebra from the sacrum, with resultant slippage forward on the sacrum, a congenital defect called spondylolisthesis. When plaintiff first went to Dr. Cooper he was 33, an age of lessening resiliency, and was experiencing low back discomfort. In a spondylolisthesis case pain comes from deterioration due to stress or pressure. Plaintiff was grossly overweight and had been doing heavy work in the City and County garbage department since November 1947. He had experienced pain for two or three months before he went to Dr. Cooper, with sharp pain experienced during handling of a garbage can shortly before the first visit to Dr. Cooper.

Because of plaintiff's overweight and heavy pursuit, a spinal graft to hold immobile the zone where the slippage was occurring was performed July 7, 1948. Plaintiff was

fitted with a back brace. He saw his doctor frequently during 1948 and 1949.

In July, 1949, a year after this first operation, in addition to some discomfort in the back, there was discomfort in the right hip and knee indicative of a new condition, as was concluded by Dr. Cooper in December, 1949. Thereafter Dr. Cooper did not see plaintiff again until September 8, 1950. At that time, he complained of pain when sitting down, also when standing for long periods.

The leg symptoms had increased and because of this a decompression operation was performed on November 1, 1950, to remove some bone which had grown around the first sacral nerve and relieve the pressure on the nerve. At the time, as testified by Dr. Cooper, "we felt that in such a large man that probably some additional bone graft would have to be placed on there sooner or later, but we did not wish to do it at that time."

On January 22, 1951, after the leg complaints had cleared up, a third operation was performed to "repair the so-called decompressed area and put more bone to make it more solid." This operation was to fuse the third, fourth and fifth lumbar vertebrae together with the sacrum into one solid piece to provide support and prevent pain.

In July, 1951 plaintiff resumed work, driving a taxi at night. He was supplied with a brace for additional support when driving. He was advised against heavy bus driving, which Dr. Cooper considered "more rugged," because of the heavier wheel, clutch and brake.

Dr. Cooper testified that there was a 55% chance of obtaining a solid fusion in the January, 1951 operation. In this case a pseudarthrosis condition developed. A pseudarthrosis, it was explained, is a "separation or breakage" in the graft "making a place of motion" shown by the four-way bending test. In this case there was "slight

motion" between the fourth and fifth vertebrae and "considerable motion" between the third and fourth vertebrae "almost as if it wasn't even fused" on the side bend. This appeared in x-rays taken in September, 1951 and March, 1952.

Dr. Cooper testified that this pseudarthrosis condition was not necessarily painful, and quoted statistics that in 41% of such cases it is not painful. However, as he further testified, in a case of incomplete graft even if the patient does not feel pain there is a tendency for it to keep on irritating and becoming separated. Driving a hard-steering bus with a hard clutch might aggravate the pseudarthrosis condition, as might sitting long hours and other stress factors.

At about the time of a visit to Dr. Cooper on August 8, 1952, plaintiff went to work as a bus driver. The doctor told him it would be all right to drive the bus if he used the brace. There was slight back discomfort at that time but no leg pain.

Dr. Cooper had seen plaintiff from time to time since his 1951 operation, and saw him again on September 17, 1952, at which time he was "improved enough to work regularly." The record of this visit contained no indication of pain. "Marked improvement" was noted. For the next eleven months Dr. Cooper did not see plaintiff, until the day after the accident.

Plaintiff testified, concerning this eleven-month period, that he had no pain or discomfort, worked as a bus driver 48 hours or more a week, and from October, 1952 had an additional job washing buses at which he worked from 15 to 25 hours a week. He wore the brace while driving, until he discarded it the latter part of 1952 or early in 1953. It was out of repair, as found by Dr. Cooper in September, 1953, at which time, as below noted, plaintiff was directed to resume wearing it.

Plaintiff further testified that when he went to Dr. Cooper the day after the accident the lower part of his back hurt and the pain extended to the right side and leg. He described this as "severe pain" sustained from the time of the accident, the same type of pain, and increasing until it became so bad he was obliged to stop working, both his regular job and extra job, in December, 1954. He further testified that from the time of the accident to December, 1954, no incident occurred in which his back suffered any shock or strain.

The trial court did not accept this testimony, finding instead that it was not until September 5, 1953, after a certain ankle injury described below, that plaintiff complained of back pain of any significance. There was no severe pain until December 23, 1953. The record bears this out. In fact, there was no showing of any visits to the doctor after completion of treatment of the ankle injury at the end of September, 1953, until x-rays were taken November 2, 1953, at which time no material injury from the accident was found.

When plaintiff saw Dr. Cooper the day after the accident, August 26, 1953, the discomfort in the back was when the back was pressed upon. According to the doctor's report of that date to the employer's insurance company, he was able to bend in all directions without much difficulty and only in the muscles of the low back was there "some slight tenderness to the muscles." On August 29, 1953, Dr. Cooper saw plaintiff again, but the doctor's records did not show any complaint of back injury on this occasion.

X-rays had been taken on August 26, 1953, the day after the accident. They did not show material change from the condition before the accident. While Dr. Cooper testified that the effect of the accident would not necessarily show up in the x-rays and that absence of notation

of a complaint did not necessarily show there was none, he also testified that the conclusion "no evidence of bony injury," stated in his records and reports of the period August 26-29, 1953, was based on the entire examination of plaintiff.

Dr. Cooper's notes of his August 26, 1953 examination of the plaintiff show, and the trial court found, that in the accident plaintiff suffered a slight contusion to the scalp directly over the left ear; a contusion of the right biceps muscle in its upper half; contusion of the seventh rib in the left mid-axillary line; tenderness along the crest of the right hip bone; deep muscular pain in the muscles about the right outer buttock; abrasions and contusions about the left knee and upper left leg, also along the right shin; some discomfort in the mid-line of the lower back. The accident was, as conceded by defendant, "devastating." However, at the time Dr. Cooper thought that plaintiff had gotten off light. As he put it, a man of plaintiff's obesity was "self padded." In the report to the insurance company made August 26, 1953, he stated: "Our final diagnosis is that the above has sustained multiple soft tissue injuries without evidence of any skeletal or bony disability. We see no reason, because of his exceptional recovery, why he cannot within a very short period return to his regular driving duties."

Soon after the accident plaintiff returned to work. The night dispatcher was ill, and plaintiff took his place dispatching at night. This involved both standing and sitting. Plaintiff also drove a school bus on one forty-five minute run in the morning, and he resumed his extra job of washing buses.

It was on September 4, 1953 that plaintiff sprained his ankle getting out of an automobile. This was treated on five occasions between September 5 and 25. As described by plaintiff he sprained his ankle in the follow-

ing manner: He was getting out of his car, had his right hand on the steering wheel of his car, in getting out caught his left heel on the running board, and twisted the ankle. On December 15, 1953, notes made by Dr. Cooper showed that the left ankle still was uncomfortable when plaintiff stood too long.

Dr. Cooper at first did not have before him the record showing that the ankle injury had occurred before the September 5, 1953 visit, and thought the ankle first was treated on September 8, 1953. This was straightened out after Dr. Cooper had given all of his direct testimony and a good part of his testimony on cross examination. At the point of the trial when Dr. Cooper assumed that the ankle injury was after the September 5, 1953 visit, he testified that the ankle injury had nothing to do with the case, that "99% of ankle accidents are not associated with anything else except ankle accidents." After the confusion in dates was straightened out he still testified that an ankle injury rarely affects the spinal column.

On September 5, 1953, it was found that bending of the back to the left caused pain in the lumbosacral area. Standing, plaintiff got a slight deep ache in the low back. This was the first back complaint, other than muscular tenderness. On another visit in September plaintiff was directed to resume use of his back brace. On September 25, he had diathermy because of back pain.

Further x-rays were taken in November, 1953, and on November 13, 1953 were examined by Dr. Cooper, who reported to the insurance company that all of the extraneous symptoms had cleared up. Further: "The only discomfort, and this is slight and improving very markedly, is that as referred to the low back." According to this report, plaintiff did not feel the necessity of using a spinal brace at that time, and was making "very little complaint relative to the back."

After review of the x-rays the November 13, 1953 report continued: "It is not felt, however, that the accident in any way materially brought injury to the low lumbar spine, and that this slight bit of motion in the area of attempted fusion probably has been residual following the graft." At this time the final diagnosis as to the spine was: "Strain of lumbosacral spine of 4th and 5th joints improving. Slight mobility of this area not chargeable, it is felt, to the accident, but it is felt that the accident did lend some extra strain to this area."

Dr. Cooper testified, as to this report, that the statement therein as to improvement was based not only on the x-rays but also on the patient's statements and all other aspects of the case. But he also testified that a reasonable result of the strain from the accident would be the decompensation which required the operation.

Toward the end of November, 1953, upon the death of his father, plaintiff flew to Pennsylvania and back, spending eighteen to twenty hours in flight each way, and remaining away for two weeks. One week after his return he saw Dr. Cooper, December 15, 1953. It was found there was no pain on the side to side bend, or on the back bend, but there was slight pain bending forward. Plaintiff at that time said there was no discomfort when he took long rides.

However, on December 23, 1953, plaintiff complained of backache when he sat very long, and upon getting up after sitting down. He told Dr. Cooper "he never had felt like this before in the past five years. This was something new since the accident. * * * he was doing very well up until the accident." On March 8, 1954, he visited his doctor complaining of pain in the low back radiating down into the right buttock. He had more pain when sitting than when moving about. At that time, and for more than a month previously, he had resumed his regular

bus driving job and his extra job washing buses.

Dr. Cooper testified as to the November and December x-rays that, though he felt at that time the fusion was satisfactory, in retrospect good fusion was not shown. On June 28, 1954, there were x-rays which showed considerable motion in the third joint, and a narrowing of the joint or disc between the fifth lumbar vertebra and the sacrum. Dr. Cooper testified that the wearing away of the disc was an instance of the inability to adjust to conditions, and felt that there was some aggravation from the accident. The stress factors elsewhere enumerated possibly contributed to this aggravation, he stated. However, it was not possible to say whether a portion of the disc had disappeared by fragmentation or drying out.

From the end of November, 1954, there were frequent visits for treatment for back pain. Plaintiff was driving a difficult bus and there was no light job for him. An operation was decided upon, and was performed in two stages, on January 19 and February 21, 1955. Another operation was performed on July 23, 1955, a minor one to remove about a quarter of an inch of the grafted bone.

In the operation performed in January and February, 1955, two large defects across the zone of fusion, *i. e.,* zones of nonunion, were cleansed of all the abnormal tissues and new fresh bone placed across these two defects. As testified by Dr. Cooper: "These defects have healed subsequently into a very solid firm fusion which x-rays very nicely portray at this time." After this solid fusion was obtained, the pain stopped.

Dr. Cooper didn't know what had caused the nonunion. He was unable to determine whether the deterioration of the joint caused the pain or whether it was the nonunion or fracture. The 1955 operation did not do anything to the disc but did stop the pain. However, Dr. Cooper could not say whether that eliminated the disc as a cause.

It was in the July 1, 1954 report, after x-rays had shown a narrowing of the disc between the fifth lumbar vertebra and sacrum, that Dr. Cooper reported: "It is felt quite likely, in view of the fact that there has been a reproduction of the pain element, that some definite change in this last joint did take place as a result of the accident. * * * The present complaints * * * have been due to the accident and represent a reaggravation of previous symptoms not present when he was injured."

In a January, 1955 report to the insurance company Dr. Cooper concluded that fracture or separation of the graft was caused by trauma, as distinguished from pulling apart of the fused bone by constant walking and moving, which the same report indicated frequently happens.

According to Dr. Cooper, the accident of August 25, 1953, "represented a moment of great stress," force that "is going to be transmitted to a weakened zone of the spine to make it symptomatic," and he assumed this to be "the only extra factor that came in here." With a back like plaintiff's, in case of a severe stress resulting in some pain it would be characteristic for the pain to increase in intensity over a period of time, he testified. At the time of the accident plaintiff "was living with this situation in a compensatory manner, comfortable, if you will, so that he didn't require the services of a physician." The "abnormal broken lines across the graft * * * could have been there before the accident; that makes no difference. He was living with this situation, I believe. If he couldn't live with it following the accident, I would say a situation of decompensation entered here * * *. That is my way of classifying this situation. It came to a certain point after a reasonable period of observation."

The tenor of the reports up to July 1, 1954, weighs against Dr. Cooper's conclusion. There was no severe pain until the end of December, 1953. Dr. Cooper's final con-

clusion is based on the supposed satisfactory condition of plaintiff's back before the accident, yet plaintiff was discredited in his testimony that he suffered severe pain from the time of the accident, and the trial court, of course, could conclude that this affected the credibility of plaintiff's entire testimony. This leaves the supposed satisfactory condition before the accident dependent upon the absence of visits for the eleven months immediately preceding. But Dr. Cooper testified that increasing infrequency of visits was the usual pattern in the post-operative period. He stressed the improvement noted at the time of the last 1952 visit, yet the eleven months of succeeding absence from the doctor's office were taking their toll in stress on plaintiff's back for he was pursuing a very heavy schedule.

Dr. Cooper himself testified that these stress factors could have caused the pain complained of after the accident. However, he further testified that the stress of the accident "may have caused damage in a shorter period of time that might have taken years otherwise." But this latter view is as speculative as the conclusion that plaintiff would have continued to be comfortable had it not been for the accident.

Dr. J. Warren White, an expert in orthopedic surgery, called by the plaintiff, had examined plaintiff in July, 1954. He had not examined previous x-rays of the patient. He considered it conclusive that the rupture of the fusion was the cause of the disability. As to the cause of the rupture, he did not pay particular attention to that in his examination, which was for the purpose of recommending what should be done in the case. He at first attributed the rupture to the accident. "* * * after a fusion operation had been done and the patient were free from pain following that, the chances are that anything short of a major accident would not cause any trouble," he stated. The

fact that a separation of the bone surfaces had occurred before the accident was developed later in the trial, as was the fact of the ankle injury.

Upon the assumption that the separation of the fusion had shown up before the accident (as was the fact), he testified that "there is considerable question as regards the part played by the accident; but on the other hand * * * there are other things associated in a back that don't depend on bony union * * * and it is only common sense * * * to feel that where a man was working regularly before a certain accident and then had to quit * * * that the accident had something to do with it."

Dr. Paul Withington, a physician and surgeon who has done extensive work in bone surgery and orthopedics, was called by the defendant. He had examined the x-rays taken after the January, 1951 operation, including those taken after the accident. Speaking of the nonunion of the graft, he testified that where a fusion in the lumbo-sacral area is not complete and motion is possible, "the slightest bit of turning may put pressure on the spinal * * * nerves." Further: "If * * * motion pinches this nerve * * * there is usually instant pain * * * but that pain might not last if the pressure was relieved. * * * the pain is due to pressure on this nerve coming out of the notch primarily, and that that can occur from a little overgrowth, it can occur from any number of things, and direct violence is not by any means the commonest cause." The ankle sprain "probably was just as much of a possibility of hurting his back as the description of what happened in the automobile accident." He couldn't tell what the cause was.

Dr. Withington had known of patients who had lived comfortably with a pseudarthrosis. However, the results of such an abnormality may not be ascertained for years, he testified. Further: "Now the fact that he went long

periods without any trouble doesn't say that he was cured, and from my point of view I can bring all kinds of authorities for this statement, that these backs are never cured by operative procedure unless you get complete fusion."

Dr. Withington concluded that: "* * * without any sufficiently acute pain to keep him from working immediately afterward [after the accident], I certainly would be loath to associate it with that when there was a history already of so much suffering, and with a knowledge that you still had an ununited bone graft * * *." Further: "* * * his condition was such in the year * * * 1952 to 1953, that at any time a comparatively trivial thing could have thrown him into a situation where he had pain." Moreover: "* * * it seems to me unlikely that he could have had trauma to the nerve sufficient — of sufficient seriousness to give him pressure—I mean to cause pain—and not have it recorded in an examination immediately afterwards."

Since plaintiff's case depends so largely upon the supposed absence of pain for the eleven months before the accident in contrast with the pain sustained thereafter, this testimony is significant.

Upon evaluation of the evidence in a case of this kind, the sequence of events may convince the trier of facts that, as a matter of common sense, the accident must have activated or aggravated the disease or physical defect to which the plaintiff was subject, and if there is medical testimony that this theory is reasonable, he may follow his own common sense bent. On the other hand, there may be testimony which convinces him that this theory is too speculative to be accepted. Here the latter was the case.

As stated by the court below, besides the accident other possible causes were the ankle injury, overweight, work of driving heavy buses and washing cars, and possibly the long plane trips. The court was not required to identify

the cause and did not, it being sufficient that the plaintiff had not met the burden of proof resting upon him to establish the accident as the cause.

After reviewing the record, we are not "left with a definite and firm conviction that a mistake has been committed by the trial court." Hence, we cannot say that the finding of the trial court is "clearly erroneous." *Hawaii Builders Supply Co.* v. *Kaneta,* 42 Haw. 111, 116, 121; *Miller* v. *Loo,* 43 Haw. 76, 82; H.R.C.P., Rule 52(a).

Judgment affirmed.

*Arthur B. Reinwald (Robertson, Castle and Anthony* on the briefs) for appellant.

*Katsugo Miho (Fong, Miho, Choy and Robinson* on the briefs) for appellee.