**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-14-0001030
05-MAY-2020
09:03 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

ESTATE OF ROBERT FREY,
Petitioner/Plaintiff-Appellant,

vs.

ROBERT P. MASTROIANNI, M.D.,
Respondent/Defendant-Appellee.

_____

SCWC-14-0001030

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0001030; CIVIL NO. 07-1-0206(1))

May 5, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

Following the death of Robert Frey ("Frey") in 2004, his estate and several family members initiated proceedings against Dr. Robert Mastroianni ("Dr. Mastroianni") before a medical claim conciliation panel ("MCCP"), claiming that Dr. Mastroianni's negligence was the cause of Frey's death. The case eventually led to a 2014 trial in the Circuit Court of the

Second Circuit ("circuit court"). After the sole remaining plaintiff, the Estate of Robert Frey ("the Estate"), rested its case, the circuit court granted judgment as a matter of law to Dr. Mastroianni.

The circuit court held that it had no jurisdiction over the Estate's "loss of chance" claim—that is, its claim that Dr. Mastroianni's negligence caused Frey to lose a chance of recovery or survival—because such a claim was not raised before the MCCP. And it held that the Estate had failed, as a matter of law, to present sufficient evidence of causation to make out a claim. The Intermediate Court of Appeals ("ICA") affirmed. Estate of Frey v. Mastroianni, No. CAAP-14-0001030, 2018 WL 3199216, at *12 (App. June 29, 2018) (mem.). The ICA concluded that "loss of chance" claims seek recovery for a "separate compensable injury[,]" and that the Estate's failure to raise loss of chance before the MCCP deprived the circuit court of jurisdiction. Id. at *7. It also concluded that, during trial, the Estate had "failed to provide any expert medical testimony establishing that Dr. Mastroianni caused Frey's death 'to a reasonable degree of medical probability.'" Id. at *11.

We accepted certiorari to resolve the question of whether the "loss of chance" doctrine is consistent with Hawai'i law and to provide additional guidance regarding the MCCP pleading process. In brief, we hold that while a "loss of

2

chance" is not a separate compensable injury under Hawai'i law, a factfinder in a medical malpractice case involving the death of a patient may consider a loss of chance theory in determining legal causation under our traditional framework for negligence, which considers whether an actor's conduct was a substantial factor in bringing about the harm.  See Mitchell v. Branch, 45 Haw. 128, 132, 363 P.2d 969, 973 (1961).  We also clarify that the pleading requirements before MCCPs, now renamed MICPs, are intended to be relatively simple, requiring only a brief description of the facts underlying the claim, not a detailed legal theory of the case.  Thus, we hold that the circuit court had jurisdiction over the Estate's negligence claim, including its loss of chance arguments, in the present case.  We hold further that the circuit court erred in holding that the Estate failed as a matter of law to present sufficient evidence of causation to make out a claim.  We remand the case for a new trial in light of this opinion.

## I.  BACKGROUND

### A.  Medical Claims Conciliation Panel Proceedings

On June 13, 2006, the Estate and several of Robert Frey's family members (collectively, "the Claimants") submitted a letter ("the Claim Letter") to a medical claim conciliation

panel.[1]  In the Claim Letter, the Claimants alleged that Frey

died as a result of the negligence of his treating physician,

Dr. Mastroianni.  The Claim Letter made the following factual

and legal allegations and demand:

> Pursuant to Hawaii Revised Statutes, 671-1, et seq., Claimants . . . hereby present a claim for damage resulting from Robert Frey's death, which occurred as a result of the negligence of the following respondent:
>
> Robert P. Mastroianni, M.D.
>
> . . .
>
> The Claimants are the estate of Robert Frey, and his parents, brother, and sisters as individuals.  Robert Frey was born on March 2, 1946.  He died on June 15, 2004.  He was fifty-eight years old at the time of his death.  Respondent Robert P. Mastroianni, M.D., is a medical doctor who provided care to Robert Frey.
>
> The background and circumstances of this claim are as follows:  On June 11, 2004, Robert Frey was visiting Maui and staying with a friend.  Sometime during that day Mr. Frey inadvertently ingested an immense dose of gamma hydroxy butyrate (GHB).  The GHB was contained in a juice bottle in the refrigerator of his friend's home and Mr. Frey used it, thinking that it was just juice, to make a smoothie in the blender.  Thereafter, as a result of the effects of the GHB, Mr. Frey fell while within the residence, apparently hitting his head on a table.  He was found unconscious by his friend and another person.  An ambulance was eventually called and Robert Frey was taken

---

[1]  At the time, Hawai'i Revised Statutes ("HRS") § 671-12(a) (1993) provided:

> [A]ny person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the medical claim conciliation panel before a suit based on the claim may be commenced in any court of this State.  Claims shall be submitted to the medical claim conciliation panel in writing.  The claimant shall set forth facts upon which the claim is based and shall include the names of all parties against whom the claim is or may be made who are then known to the claimant.

In 2012, the legislature amended HRS Chapter 671 to re-designate MCCPs as "medical inquiry and conciliation panels" ("MICP") and "claims" as "inquiries."  2012 Haw. Sess. Laws Act 296, § 4 at 1006-15.

to the emergency room at the Maui Memorial Medical Center. From the emergency room, Mr. Frey was transferred to the intensive care unit. Respondent Robert P. Mastroianni, M.D. was his treating physician. Over the next two days, Mr. Frey emerged from his coma and began to recover. On June 13, 2004, Dr. Mastroianni discharged Mr. Frey in "stable condition," on oral antibiotics with a diagnosis of "bronchitis," despite the facts that (1) it was documented that Mr. Frey had vomited several times while unconscious, (2) his most recent chest x-ray (of the day before) showed evidence of developing pneumonia, (3) he had a fever of 102 degrees, and (4) he was coughing. Dr. Mastroianni did not order new x-rays on the day of Mr. Frey's discharge. During the evening of June 13th Robert developed difficulty breathing, and the next morning he was rushed back to the hospital. Following treatment in the emergency room, he was admitted with a diagnosis of pneumonia, hypoxia, sepsis, and severe metabolic acidosis. His condition quickly deteriorated, and at 11:05 a.m. on Tuesday June 15, 2006 [sic], Mr. Frey died. The pathologist who conducted the autopsy listed the immediate cause of death as severe necrotizing pneumonia, with contributing conditions of sepsis and gamma hydroxy butyrate intoxication.

Claimants allege that Robert P. Mastroianni, M.D., fell below the applicable standard of care in multiple respects, including but not limited to the following: (1) failing to start Mr. Frey on broad spectrum intravenous antibiotics soon after the first admission, when it became clear that he had pneumonia; (2) discharging the patient on June 13th without determining the reason for his fever; (3) not repeating the chest X-ray on June 13th, which would clearly have shown pneumonia; and (4) misdiagnosing Mr. Frey's condition as bronchitis, despite the evidence of his chest x-rays, his fever of 102, and his probable aspiration of vomit while he had been unconscious.

If Dr. Mastroianni had administered antibiotics in the hospital on June 11th or 12th, repeated the chest x-ray on June 13th, and kept Mr. Frey in the hospital for further observation and treatment, then with the benefit of closer observation and care it is likely that he would have survived.

Wherefore, Claimants demand judgment against the above-stated respondent for such general and special damages to which Claimants shall be entitled pursuant to the proof adduced at the hearing which is sufficient to invoke the jurisdiction of the Circuit Court of the State of Hawaii, together with costs of suit, pre-judgment and post-judgment interest, and such further relief, both legal and equitable, as this panel deems appropriate.

On February 28, 2007, the Claimants submitted a pre-hearing statement to the MCCP which repeated these allegations.

In April 2007, the MCCP decided in favor of the Claimants.  After the MCCP's decision, Dr. Mastroianni took the position that he would not pay the award.[2]

## B.  Circuit Court Proceedings

### 1.  Pleadings

On June 12, 2007, the Claimants filed a complaint in the circuit court against Dr. Mastroianni.  The complaint alleged one count of "Negligen[c]e (Medical Malpractice)" and one count of "Wrongful Death[.]"  As to the negligence count, the complaint alleged facts mirroring those in the Claim Letter and claimed that "[t]he medical care rendered by [Dr. Mastroianni] to Robert Frey fell below the applicable standard of care, and constituted a lack of due care and a negligent act on the part of [Dr. Mastroianni.]"  The complaint alleged that, "[h]ad [Dr. Mastroianni] not violated the applicable standard of medical care . . . , Mr. Frey's life could have been saved[,]" and that, "[a]s a direct result of [Dr. Mastroianni's] negligence, Robert Frey experienced severe pain and suffering and then died."  As to the wrongful death count, the complaint claimed that Dr. Mastroianni's "negligent actions were a substantial factor in causing Robert Frey's death[,]" or, in the

---

[2]     If a party to an MCCP hearing rejects the decision of the MCCP, the claimant is then permitted to institute litigation based on the claim in an appropriate court.  HRS § 671-16(a) (Supp. 2003).

alternative, that "[Dr. Mastroianni's] negligent treatment deprived Robert Frey of a significant improvement in his chances for recovery, and/or resulted in a loss of an increased chance of recovery, which loss of chance is compensable in and of itself."  The complaint alleged that Dr. Mastroianni was liable to the Estate for Frey's "pain and suffering, loss of enjoyment of life, economic loss, and other damages" and to the other Claimants for "their loss of consortium, emotional distress, economic loss, and other damages."

Dr. Mastroianni filed an answer on July 27, 2007 in which he denied all allegations of negligence.  The trial date was continued multiple times over the following years, during which time all of Frey's family members' claims against Dr. Mastroianni were dismissed with prejudice, leaving the Estate as the sole plaintiff.

## 2. Trial Testimony

Jury trial commenced on July 7, 2014.[3]  Along with two lay witnesses, the Estate called three expert witnesses:  Dr. Peter Schultz, Dr. Bradley Jacobs, and Dr. Darvin Scott Smith.[4]

---

[3]     The Honorable Rhonda I.L. Loo presided.

[4]     By permission of the court, the testimony of Dr. Jacobs and Dr. Smith was presented in the form of depositions read out in court by the attorneys.

The Estate's first expert witness was Dr. Peter Schultz, an internal medicine doctor from California. Dr. Schultz testified that he had reviewed the medical records for Robert Frey, as well as police reports, witness statements, and an ambulance report. He testified that, in his opinion, it was not appropriate for Dr. Mastroianni to discharge Frey on June 13, 2004, and that the decision to do so fell below the standard of care expected of a physician. Dr. Schultz testified that this opinion was "based on looking at the totality of the clinical picture, all of the factors that led up to his being hospitalized and his condition at the time -- at the day and time of the discharge." He stated that, if he had been the treating physician in that situation, he would have diagnosed aspiration pneumonia, and that, in his opinion, "it fell below the standard of care to not suspect pneumonia in this case." Dr. Schultz was asked what would have been different if Frey had stayed in the hospital, rather than being discharged, and he responded that Frey "would have received treatment that might have included things to help him survive until the antibiotics could take effect." When asked to elaborate on the specific measures he would have taken, Dr. Schultz responded:

> Well, the body's own defenses and the antibiotics that are used are -- do take time to work. They need to be given the time. And when you have an overwhelming infection, sometimes it overwhelms both of those measures -- the body's own immune system and the antibiotics -- before they have a chance to be effective.

> Sepsis, in particular, can progress very quickly. And time is very important in effectively treating it. If it progresses to the way we know it eventually did with Mr. Frey, and had he stayed in the hospital, he could have been treated much more quickly than he eventually was after he was discharged from the hospital. The measures that could have -- the measures could have included aggressive intravenous fluid, which would help maintain his blood pressure. When he came back very sick and eventually died, he had a very low blood pressure. There are medications that help tighten up the arteries and raised the blood pressure that are sometimes used in severe cases of sepsis. Those could have been started much sooner.
>
> They were eventually used. But by that time, it was too late. They could have been used earlier in the course. And had that happened, I think he -- there is a significant chance that he could have done better than he eventually did.

Dr. Schultz was also asked if Frey's chances of survival would have improved "significantly" if Frey had remained in the hospital; he affirmed that such was his opinion. He testified further that the steps that were taken to combat sepsis when Frey was readmitted to the hospital were taken too late, and that "they could have done them in an earlier time, and his chances would have been significantly improved." Finally, Dr. Schultz was asked, "[a]re all the opinions that you've given in court today to a reasonable degree of medical probability?"; he responded, "[y]es, they are."

The Estate's second expert witness was Dr. Bradley Jacobs, a primary care doctor from California. Dr. Jacobs testified that he had reviewed the full medical reports for Frey's treatment. He testified that he believed that Dr. Mastroianni "did not abide by the standard of care in the

treatment of Mr. Frey." Specifically, he testified that Dr. Mastroianni "discharged the patient too early and gave him an inappropriate diagnosis of bronchitis" and that Frey "should have been kept in the hospital and monitored until it was clear that his infection had resolved, that he was stable to be discharged home." He stated that his conclusion that Frey should not have been discharged was based on reviewing Frey's vital signs. He also testified that Frey should have been diagnosed with multi-lobar pneumonia. Dr. Jacobs was asked, "[a]re the opinions that you have expressed here today to a reasonable degree of medical certainty?"; he responded, "[y]es."

The Estate's third expert witness was Dr. Darvin Scott Smith, an internal medicine doctor from California with a specialty in infectious diseases and geographic medicine. Dr. Smith testified that, with regard to Frey's case, he had reviewed medical records and other relevant documents. He testified that Frey had contracted Klebsiella pneumonia by the time he was discharged from the hospital on June 13, 2004, and that the pneumonia had caused his sepsis and eventual death. He was asked what Dr. Mastroianni should have done on June 13, 2004 according to the standard of care, to which he responded:

> So based on the observed signs, the vital signs in particular, and his recent history of intubation, aspiration, and persistent fevers throughout his hospitalization, it would have been best practice and standard of care to continue to observe him closely and

> address all of those observations in a timely way such that he would have responded appropriately.

Smith testified that it was his understanding that Dr. Mastroianni did not do those things, and that, therefore, Dr. Mastroianni did not comply with the standard of care when he discharged Frey from the hospital. Dr. Smith was also asked about the care Frey received on June 12, 2004, and testified as follows:

> And if care had been rendered in an ongoing fashion on that day, when it was apparent that it should have been, including perhaps, but not necessarily a follow-up x ray, but certainly administration of fluids to resuscitate him for low blood pressure and his high pulse, possibly empiric antibiotics for what I believe was an incipient but developing pneumonia observed originally, and oxygen supplementation either by nasal cannula, maybe a mask, or possibly even if he needed a later intubation.
>
> But being in the hospital, under close observation, such that those steps could be taken, if indicated, would all ensure his safety.

He also testified that there would have been "an advantage" to Frey being administered antibiotics in the hospital, rather than at home following his discharge, and that Frey could have been given fluids and other antibiotics at the hospital with the correct diagnosis. He testified that the main thing that would have been different would have been the timing, and that "[s]ooner is better when you're dealing with a critical illness like this. And so he would have responded much better had that been addressed right away." He was asked if "it was just too late" when Frey was readmitted; he responded that he "believe[d]

11

it was at that point."  He testified that Dr. Mastroianni's

diagnosis of bronchitis was incorrect.  Dr. Smith was asked,

"[a]re all of the opinions you've expressed today to a

reasonable degree of medical certainty?"; he responded, "[y]es."

### 3.  Judgment as a Matter of Law

After presenting the testimony of its three expert

witnesses, the Estate rested its case.  Dr. Mastroianni moved

for judgment as a matter of law pursuant to Hawai'i Rules of

Civil Procedure ("HRCP") Rule 50(a)[5] "on the grounds that [the

Estate could not] establish with reasonable medical probability

that Dr. Mastroianni's care and treatment of Robert Frey was the

cause of Mr. Frey's death."  In a memorandum in support of the

motion, Dr. Mastroianni argued that the Estate provided "no

expert testimony from any witness to establish the required

causal connection between any negligent act or omission by Dr.

Mastroianni and the death of Robert Frey" and that Dr.

Mastroianni was therefore entitled to a judgment in his favor on

---

[5]    HRPC Rule 50(a) (2000) provides:

(1)  If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2)  Motions for judgment as a matter of law may be made at any time before submission of the case to the jury.  Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

the wrongful death claim. Dr. Mastroianni also argued that the Estate was not permitted to pursue "a claim for lost chance of survival under the loss of chance doctrine" because such a claim "(1) was never presented at the MCCP proceeding that preceded the filing of the complaint, thereby depriving [the] court of jurisdiction to hear any such claim; (2) was not plead[ed] in the complaint itself; and (3) is not a recognized cause of action in this jurisdiction."

The Estate argued that there was sufficient evidence of negligence to overcome a motion for judgment as a matter of law. It argued that Hawai'i had effectively adopted the loss of chance doctrine, not as a separate cause of action, but as a theory of causation that may result in an apportionment of damages. In the alternative, it argued that Dr. Mastroianni's negligence was a substantial factor leading to Frey's death. It also argued that a plaintiff's failure to plead a damages theory at the MCCP is not a jurisdictional bar.

The circuit court granted Dr. Mastroianni's motion for judgment as a matter of law. The court stated that it considered the Estate's claim for loss of chance as separate from the wrongful death claim, and found that, irrespective of whether the claim is recognized as a valid claim under Hawai'i law, it lacked subject matter jurisdiction over the claim because the Estate failed to raise the claim before the MCCP.

Turning to the wrongful death claim, the court found that none of the Estate's experts "opined to a reasonable degree of medical probability as to whether Mr. Frey would have survived had he not been discharged by Dr. Mastroianni." "Therefore, even after considering the evidence in the light most favorable to [the Estate]," the court found that "[the Estate could not] establish with reasonable medical probability that Dr. Mastroianni's care and treatment of Robert Frey was the proximate or contributory cause of Mr. Frey's death." On July 25, 2014, the court entered judgment in favor of Dr. Mastroianni on all claims.

## C. ICA Proceedings

The Estate appealed the judgment to the ICA. Estate of Frey, 2018 WL 3199216, at *1. The Estate argued that the circuit court erred in finding it had no jurisdiction over a loss of chance claim, in rejecting loss of chance as a theory of causation, and in granting Dr. Mastroianni's motion for judgment as a matter of law.[6] The ICA affirmed the trial court's judgment. Id. at *12.

---

[6] In its appeal to the ICA, the Estate also challenged several of the circuit court's evidentiary rulings. However, as none of its claims of error with regard to the evidentiary rulings were raised in the Estate's application for writ of certiorari to this court, we do not address them. See Hawai'i Rules of Appellate Procedure Rule 40.1(d)(1) ("Questions not presented according to this paragraph will be disregarded.").

The ICA concluded that, in medical malpractice actions in which the patient dies, "the loss of chance doctrine is consistent with Hawai'i law and should be recognized as a separate compensable injury[.]"  Id. at *7 (citing McBride v. United States, 462 F.2d 72 (9th Cir. 1972); Craft v. Peebles, 78 Hawai'i 287, 305, 893 P.2d 138, 156 (1995); Barbee v. Queen's Med. Ctr., 119 Hawai'i 136, 164, 194 P.3d 1098, 1126 (App. 2008)).  However, it held that the Estate did not assert a loss of chance claim in its Complaint Letter to the MCCP.  Id. Because it also concluded that "[d]ismissal of a civil suit based on a medical tort claim is proper where a claimant files a suit before first having submitted a statement of the claim to the MCCP[,]" id. at *3 (citing Dubin v. Wakuzawa, 89 Hawai'i 188, 198, 970 P.2d 496, 506 (1998); Buenafe v. Kiehm, No. 29237, 2011 WL 1713493 (App. May 4, 2011) (SDO)), the ICA held that "the circuit court did not err when it dismissed the Estate of Frey's loss of chance claim because it lacked subject matter jurisdiction over the claim."  Id. at *7.

With regard to Dr. Mastroianni's motion for judgment as a matter of law, the ICA held that "the expert medical testimony" of the Estate's witnesses "fell short of providing a causal nexus between Dr. Mastroianni's alleged negligence and Frey's death."  Id. at *9.  The ICA stated:

15

> The expert medical testimony provided at trial, at most, established that had Frey remained in the hospital, his chance of a better outcome would have improved. This evidence only indicates that it was merely a possibility that Dr. Mastroianni caused Frey's death, "a showing which the Hawai'i supreme court explicitly found to be insufficient in Craft, 78 Hawai'i at 305, 893 P.2d at 156." Barbee, 119 Hawai'i at 163, 194 P.3d at 1125.

Id. at *11. The Estate, the ICA said, "failed to provide any expert medical testimony establishing that Dr. Mastroianni caused Frey's death 'to a reasonable degree of medical probability.'" Id. Thus, it held that the circuit court did not err in granting Dr. Mastroianni's motion for judgment as a matter of law. Id.

**D. Supreme Court Proceedings**

The Estate filed an application for writ of certiorari with the supreme court. In its application, the Estate presented the following questions:

> A. Whether it was error for the Intermediate Court of Appeals ("ICA") in its Memorandum Opinion dated June 29, 2018, to affirm the trial court's written order granting Defendant's Rule 50 motion for judgment as a matter of law on the grounds that the trial court lacked jurisdiction over a "loss of chance" claim, because the loss of chance claim had not been properly asserted in Plaintiff's MCCP Claim Letter. This question is comprised of the following subsidiary questions:
>
> > 1. Whether the legislature's intent, in establishing the MCCP (now the MICP) was to establish an informal, advisory forum, or to establish a formal setting with strict pleading standards.
> >
> > 2. Whether the legislature's requirement, in the MCCP/MICP statute (Haw. Rev. Stat. §671-12) that "the Claimant . . . set forth facts upon which the claim is based" was intended to require of Plaintiffs a full, formal statement of all legal theories upon which a claim may be based.

16

3.   Whether the "loss of chance" doctrine based on medical negligence must be asserted as a separate legal theory in an initial MCCP statement, or whether it may be considered subsumed in a more general medical negligence claim.

4.   Whether the bar from subsequent litigation, Haw. Rev. Stat. § 671-16, is to be construed to preclude litigation on any theories of liability that are not explicitly and meticulously pled by a Plaintiff in its MCCP statement.

B.   Whether it was error for the ICA to affirm the trial court's written order finding that Plaintiff had not established causation under traditional doctrines of "substantial cause" and "but-for causation."

The application was granted.

## II.   STANDARDS OF REVIEW

### A.   Jurisdiction

"The existence of jurisdiction is a question of law that this court reviews de novo under the right/wrong standard." Uyeda v. Schermer, 144 Hawai'i 163, 170, 439 P.3d 115, 122 (2019) (quoting Bailey v. Duvauchelle, 135 Hawai'i 482, 488, 353 P.3d 1024, 1030 (2015)).

### B.   Judgment as a Matter of Law

It is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed *de novo*. When we review the granting of a motion for judgment as a matter of law, we apply the same standard as the trial court. A motion for judgment as a matter of law may be granted only when after disregarding conflicting evidence and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Kawakami v. Kahala Hotel Inv'rs, LLC, 142 Hawai'i 507, 513, 421 P.3d 1277, 1283 (2018) (ellipses omitted) (quoting Miyamoto v. Lum, 104 Hawai'i 1, 6-7, 84 P.3d 509, 514-15 (2004)).

17

## III.  DISCUSSION

**A.  Under Hawaiʻi law, loss of chance is not an independent cause of action, but may be considered in determining legal causation.**

### 1.  The Mitchell Test

"This court has long required a plaintiff to prove that the defendant's conduct was the legal cause of his or her injuries as one of the prima facie elements of negligence." O'Grady v. State, 140 Hawaiʻi 36, 43, 398 P.3d 625, 632 (2017) (citing Mitchell, 45 Haw. at 132, 363 P.2d at 973).  "We apply a two-step analysis[,]" often referred to as "the Mitchell test[,]" to determine "whether the defendant's conduct was the legal cause of the plaintiff's injuries[.]"  Id. at 44, 398 P.3d at 633.  The Mitchell test provides that

> the defendant's conduct is the legal cause of the harm to the plaintiff if
>
>> (a) the actor's conduct is a substantial factor in bringing about the harm, and
>>
>> (b) there is no rule of law relieving the actor from liability because of the manner in which [the actor's] negligence has resulted in the harm.

Id. (brackets omitted) (quoting Taylor-Rice v. State, 91 Hawaiʻi 60, 74, 979 P.2d 1086, 1100 (1999)).

Under the first prong of the Mitchell test—the "substantial factor" prong—the defendant's conduct "need not have been the whole cause or the only factor bringing about the plaintiff's injuries" in order to be their legal cause.  State v. Phillips, 138 Hawaiʻi 321, 352, 382 P.3d 133, 164 (2016)

18

(ellipses omitted) (quoting Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 390, 742 P.2d 377, 386 (1987)).  However, the conduct must have been more than "a negligible or trivial[] factor in causing the harm.  In other words, a substantial factor is one that a reasonable person would consider to have contributed to the harm."  O'Grady, 140 Hawai'i at 47, 398 P.3d at 636.

In adopting a substantial factor test for legal causation in negligence cases, the Mitchell court called it "[t]he best definition and the most workable test of legal cause so far suggested[.]"  45 Haw. at 132, 363 P.2d at 973.  We have clearly and consistently reaffirmed its use since.  See, e.g., McKenna v. Volkswagenwerk Aktiengesellschraft, 57 Haw. 460, 465, 558 P.2d 1018, 1022 (1977) ("This test represents a realistic approach to problems of causation, an area which has long been complicated by a failure to distinguish between questions of fact and policy concerns."); Knodle, 69 Haw. at 390, 742 P.2d at 386 ("[W]e are convinced that 'substantial factor' is a phrase sufficiently intelligible to furnish an adequate guide in instructions to the jury, and that it is neither possible nor desirable to reduce it to any lower terms." (quoting W.P. Keeton, Prosser and Keeton on the Law of Torts § 41, at 267 (5th ed. 1984))); Montalvo v. Lapez, 77 Hawai'i 282, 289, 884 P.2d 345, 352 (1994) (quoting Knodle); O'Grady, 140 Hawai'i at 44-47,

19

398 P.3d at 633-636 (discussing the history and policy considerations underlying the test).

As we have consistently applied the substantial factor test, we have rejected other tests for legal causation, particularly the widely-used "'but for' rule[,]" under which "the defendant's conduct is a cause of the event if the event would not have occurred but for that conduct[.]" Knodle, 69 Haw. at 389, 742 P.2d at 386 (brackets omitted) (quoting Keeton, supra, at 266). We have also never required plaintiffs to prove that "the defendant's negligence more likely than not caused the ultimate outcome[.]" Matsuyama v. Birnbaum, 890 N.E.2d 819, 829 (Mass. 2008) (explaining the "all or nothing" rule). Rather, the Mitchell test "contemplates a factual determination that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of." McKenna, 57 Haw. at 465, 558 P.2d at 1022 (emphasis added).

The Mitchell test extends to negligence claims against medical professionals. Claims of medical negligence or medical malpractice require a determination of legal causation. See HRS § 671-1(2) (1993) ("'Medical tort' means professional negligence, the rendering of professional service without informed consent, or an error or omission in professional

20

practice, by a health care provider, which <u>proximately causes</u> death, injury, or other damage to a patient." (emphasis added)).[7] Therefore, in order to prevail on a medical negligence claim, a plaintiff[8] must prove, by a preponderance of the evidence, that a health care provider defendant, acting in the defendant's professional capacity, committed a negligent act or omission which was a substantial factor in bringing about the death of, or injury or other damage to, a patient.[9]

### 2.   The Loss of Chance Doctrine Under Hawai'i Law

In the context of medical negligence, "[a] number of courts have recognized a lost opportunity (or lost chance) for cure of a medical condition as a legally cognizable harm." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 cmt. n. (Am. Law Inst. 2010).  The Supreme Court of Minnesota explained the loss of chance doctrine as follows:

> Under the loss of chance doctrine, a patient may recover damages when a physician's negligence causes the patient to lose a chance of recovery or survival.  The fundamental principle underlying the loss of chance

---

[7]     The term "proximate cause" is synonymous with the term "legal cause," although this court has generally used the latter term.  <u>O'Grady</u>, 140 Hawai'i at 43 n.3, 398 P.3d at 632 n.3.

[8]     Pursuant to HRS § 663-3(a) (2016), "[w]hen the death of a person is caused by the wrongful act, neglect, or default of any person, the deceased's legal representative . . . may maintain an action against the person causing the death or against the person responsible for the death."

[9]     Additional elements are required to establish a claim of negligent failure to obtain informed consent.  <u>See</u> <u>Barcai v. Betwee</u>, 98 Hawai'i 470, 483-84, 50 P.3d 946, 959-60 (2002).

> doctrine is that the plaintiff's chance of survival itself has value. In a loss of chance case, the plaintiff must sustain the burden of proving that the defendant negligently deprived her of a chance of a better outcome. Assuming that the plaintiff satisfies that burden, then the defendant should be liable for the value of the chance he has negligently destroyed.

Dickhoff ex rel. Dickhoff v. Green, 836 N.W.2d 321, 329-30 (Minn. 2013) (citations and internal quotation marks omitted).

The loss of chance doctrine "originated in dissatisfaction with the prevailing 'all or nothing' rule of tort recovery." Matsuyama, 890 N.E.2d at 829 (citing Joseph H. King, Jr., Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353, 1365-66 (1981)). As explained above, under the "all or nothing" rule, which is not the law in Hawai'i, "a plaintiff may recover damages only by showing that the defendant's negligence more likely than not caused the ultimate outcome . . . ; if the plaintiff meets this burden, the plaintiff then recovers 100% of her damages." Id. The problem with the "all or nothing" rule in the context of medical negligence cases is that, "[s]o long as the patient's chance of survival before the physician's negligence was less than even, it is logically impossible for her to show that the physician's negligence was the but-for cause of her death, so she can recover nothing." Id.

The origins of the loss of chance doctrine have been variously attributed to "a handful of early tort cases, the 'rescue' doctrine, certain contract cases, the Restatement (Second) of Torts [§ 323(a) (Am. Law Inst. 1965)], Hicks v. United States[, 368 F.2d 626 (4th Cir. 1966)], and a 1981 Yale Law Review article[, King, Causation, supra]." Tony A. Weigand, Loss of Chance in Medical Malpractice: The Need for Caution, 87 Mass. L. Rev. 3, 4-5 (2002) (footnotes omitted). Hicks involved facts comparable to those alleged in the present case. In Hicks, a patient was treated by a Navy physician, who diagnosed her with gastroenteritis and released her with drugs to relieve the pain and instructions to return in eight hours. 368 F.2d at 628. The patient died later that day of an undiagnosed intestinal obstruction. Id. at 629. The government argued that, even if there was negligent misdiagnosis and mistreatment on the part of the doctor, it was merely speculative that the patient would have survived. Id. at 632. The U.S. Court of Appeals for the Fourth Circuit, applying Virginia law, responded to that argument in an oft-quoted passage:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the

> patient would have lived had she been hospitalized and operated on promptly.

Id.

The vast majority of jurisdictions have considered whether or not to adopt the loss of chance doctrine. Lauren Guest, David Schap & Thi Tran, The "Loss of Chance" Rule as a Special Category of Damages in Medical Malpractice: A State-by-State Analysis, 21 J. Legal Econ. 53, 59 (2015); Matsuyama, 890 N.E.2d at 828 n. 23 (compiling cases). According to one recent survey, as of July 2014, twenty-four states had adopted the doctrine, seventeen had rejected it, four had deferred an opinion on it, and five had yet to consider it at the level of their highest state court. Guest, supra, at 59. Hawai'i is one of the few states to not have definitively addressed loss of chance. Id.; Futi v. United States, No. 08-00403JMS/LEK, 2010 WL 2900328, at *26 (D. Haw. July 22, 2010). Today, with the benefit of the analysis of the many jurisdictions that have considered this issue, we address the loss of chance doctrine and its relationship to Hawai'i law for the first time. However, our opinion is limited to the present facts: a medical malpractice case in which the patient has died as a result of the alleged negligence. We do not address situations in which a patient survives despite the alleged negligence of a medical professional, but the plaintiff nonetheless claims that medical

24

negligence deprived the patient of a better recovery.  See

Delaney v. Cade, 873 P.2d 175, 178 (Kan. 1994) (distinguishing

between "loss of survival" and "loss of better recovery" cases).

Although nearly all the states have now considered the

loss of chance doctrine, there is not a clear consensus on its

merit; nor, among those states that have adopted it, is there

agreement on what form it should take.  See Dickhoff, 836 N.W.2d

at 334 ("[A] growing number of jurisdictions have adopted some

form of the doctrine, albeit with divergent rationales.");

Matsuyama, 890 N.E.2d at 831 ("[C]ourts adopting [the doctrine]

have not approached loss of chance in a uniform way.").  While

each state has approached the issue differently, "[g]enerally,

courts have taken three approaches to loss of opportunity

claims."  Lord v. Lovett, 770 A.2d 1103, 1105 (N.H. 2001); see

Joseph H. King, Jr., "Reduction of Likelihood" Reformulation and

Other Retrofitting of the Loss-of-a-Chance Doctrine, 28 U. Mem.

L. Rev. 491, 505-09 (1998).

The first is the "traditional" approach—that is, the

"all or nothing" rule under which the plaintiff must prove that,

as a result of the defendant's negligence, the patient was

deprived of a greater than even chance of survival.  See Lord,

770 A.2d at 1105.  Courts adopting this approach have

essentially rejected the loss of chance doctrine in favor of

traditional rules of causation.  See, e.g., McAfee ex rel.

25

McAfee v. Baptist Med. Ctr., 641 So.2d 265, 267 (Ala. 1994) (declining to "recognize the 'loss of chance doctrine'" or "abandon Alabama's traditional rules of proximate cause[,]" which require the plaintiff in a medical malpractice case to "prove that the alleged negligence 'probably caused the injury'" (quoting Parrish v. Russell, 569 So.2d 328, 330 (Ala. 1990))); Mich. Comp. Laws Ann. § 600.2912a(2) (2010) ("In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%."); Jones v. Owings, 456 S.E.2d 371, 374 (S.C. 1995) ("[W]e decline to adopt the doctrine and maintain our traditional approach."); Kramer v. Lewisville Memorial Hosp., 858 S.W.2d 397, 407 (Tex. 1993) ("[W]e do not adopt the loss of chance doctrine as part of the common law of Texas."); Smith v. Parrott, 833 A.2d 843, 848 (Vt. 2003) ("The loss of chance theory of recovery is thus fundamentally at odds with the settled common law standard . . . for establishing a causal link between the plaintiff's injury and the defendant's tortious conduct.")

States that have adopted this approach—in other words, those that have outright rejected the loss of chance doctrine— have expressed a reluctance to allow recovery based on a "mere possibility" of harm when their traditional negligence rules allow for recovery only when the negligence was more likely than

not to have caused the injury. McAfee, 641 So.2d at 267; see Jones, 456 S.E.2d at 374. Some have found that the loss of chance doctrine is "fundamentally at odds with the requisite degree of medical certitude necessary to establish a causal link between the injury of a patient and the tortious conduct of a physician." Jones, 456 S.E.2d at 374 (quoting Kilpatrick v. Bryant, 868 S.W.2d 594, 602 (Tenn. 1993)); see Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1019-20 (Fla. 1984). Others, while recognizing the value of the loss of chance doctrine, have found it to be inconsistent with their medical malpractice statutes and have held that any changes to medical malpractice law are more appropriately left to legislative determination. See Smith, 833 A.2d at 848.

The shortcoming of the traditional approach, as discussed above, is that it prevents a plaintiff with a fifty percent or lower chance of survival from recovering anything as a result of a medical professional's negligence. See Lord, 770 A.2d at 1105. It has been criticized as arbitrary, unfair, and contrary to the deterrence objectives of tort law. Margaret T. Mangan, The Loss of Chance Doctrine: A Small Price to Pay for Human Life, 42 S.D. L. Rev. 279, 302 (1997). The so-called "traditional" approach has no place in Hawai'i law, because, as discussed above, we do not have a tradition of requiring plaintiffs to prove that their harm was more likely than not the

27

result of negligence by the defendant. Rather, since the earliest days of statehood, we have required plaintiffs to prove that the defendant's negligence was a substantial factor in bringing about their harm. Mitchell, 45 Haw. at 132, 363 P.2d at 973.

A second approach to the loss of chance doctrine is to recognize "the lost opportunity for a better outcome" as itself an injury for which a negligently injured patient may recover. Lord, 770 A.2d at 1105-06. States adopting this approach have essentially created a new tort which recognizes the loss of chance as a compensable injury distinct from other medical malpractice claims. See, e.g., United States v. Anderson, 669 A.2d 73, 77 (Del. 1995) ("[T]he loss of a chance of avoiding an adverse consequence, increased risk, should be viewed as an injury and be compensable[.]"); Mead v. Adrian, 670 N.W.2d 174, 178 (Iowa 2003) ("[T]he last-chance-of-survival doctrine is not an alteration of the traditional rules for determining proximate cause, but, rather, the creation of a newly recognized compensable event to which those traditional rules apply."); Dickhoff, 836 N.W.2d at 334; Lord, 770 A.2d at 1106; Alberts v. Schultz, 975 P.2d 1279, 1283 (N.M. 1999) ("[I]t is that chance in and of itself—the lost opportunity of avoiding the presenting problem and achieving a better result—that becomes the item of value for which the patient seeks compensation."); Mohr v.

28

Grantham, 262 P.3d 490, 496 (Wash. 2011) ("[T]he loss of a chance is the compensable injury[.]").

Those states that have adopted the separate injury approach to the loss of chance doctrine have identified the shortfalls in the traditional approach, and have noted that patients regard "a chance to survive or achieve a more favorable medical outcome as something of value." Dickhoff, 836 N.W.2d at 334; see Mohr, 262 P.3d 490. This approach has been defended as being "administrable and consistent[.]" DeBurkarte v. Louvar, 393 N.W.2d 131, 137 (Iowa 1986) (quoting King, Causation, supra, at 1378). We read the ICA's opinion in this case as following the separate injury approach. The ICA held that, "[w]hen one is deprived of a chance to survive due to a medical provider's negligence, the actual loss suffered is the lost chance itself and not the ultimate injury or death." Estate of Frey, 2018 WL 3199216, at *5. The ICA stated that this approach was "consistent with the traditional rules of negligence." Id. However, the separate injury approach does not clearly follow from Hawai'i's traditional negligence rules based on the substantial factor test, and it unnecessarily creates a new cause of action when our negligence rules are already flexible enough to address the problem at hand. Rather than adopting this incongruous approach, we look for guidance to a third

approach taken by a number of states with negligence rules more similar to our own.

The third approach, a "middle ground" sometimes referred to as the "relaxed standard of proof" approach, "requires [the] plaintiff to present evidence that a substantial or significant chance of survival or better recovery was lost." Pipe v. Hamilton, 56 P.3d 823, 827 (Kan. 2002) (quoting Delaney, 873 P.2d at 184-85). This approach, also referred to as the "substantial chance" approach, id. at 828, is consistent with the Mitchell test and our long-established rules of negligence. It has been adopted in a number of jurisdictions which, like Hawai'i, use a substantial factor test for proximate causation. See, e.g., Jones v. Montefiore Hosp., 431 A.2d 920, 923 (Penn. 1981); Thornton v. CAMC, 305 S.E.2d 316, 324-25 (W.Va. 1983); Ehlinger v. Sipes, 454 N.W.2d 754, 758-59 (Wis. 1990); Rivers v. Moore, Myers & Garland, LLC, 236 P.3d 284, 291 (Wyo. 2010).

For example, under Pennsylvania's negligence rules, as under Hawai'i's, "[p]roximate cause . . . may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff" and "this substantial factor need not be . . . the only factor, i.e., 'that cause which . . . produces the result.'" Jones, 431 A.2d at 923. Applying these rules in a medical malpractice action, the Supreme Court of Pennsylvania

30

held that the jury should have been instructed to impose liability if it decided that the defendants' negligent conduct "increased the risk of harm and that such increased risk was a substantial factor in bringing about the harm actually inflicted" upon the plaintiff.  Id. at 924.  Similarly, in Wisconsin, "[t]o establish causation . . . , the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm."  Ehlinger, 454 N.W.2d at 758.  In a medical malpractice case, the Supreme Court of Wisconsin held that,

> where the causal relationship between the defendant's alleged negligence and the plaintiff's harm can only be inferred by surmising as to what the plaintiff's condition would have been had the defendant exercised ordinary care, to satisfy his or her burden of production on causation, the plaintiff need only show that the omitted treatment was intended to prevent the very type of harm which resulted, that the plaintiff would have submitted to the treatment, and that it is more probable than not the treatment could have lessened or avoided the plaintiff's injury had it been rendered.  It is then for the trier of fact to determine whether the defendant's negligence was a substantial factor in causing the plaintiff's harm.

Id. at 759.  That court distinguished the substantial chance approach from the "all or nothing" rule:

> We disagree with the court of appeals' conclusion in Finn [v. Schammel, 412 N.W.2d 147 (Wis. Ct. App. 1987),] that in a case of this nature Wisconsin law follows the "all or nothing" approach.  In a case such as this, the plaintiff need not show that proper treatment more probably than not *would* have been successful in lessening or avoiding the plaintiff's injuries as a prerequisite to satisfying his or her burden of production on the issue of causation.  In addition to the other requirements previously noted, all that is required is that the plaintiff establish that proper treatment *could* have lessened or avoided the plaintiff's harm.  Compare Hicks, 368 F.2d at 632.  The trier of fact may consider evidence

31

> of the likelihood of success of proper treatment in
> determining whether the negligence was a substantial factor
> in causing the harm, and may yet conclude that it was not
> because the injuries would have occurred irrespective of
> the negligence.  *See* Restatement (Second) of Torts, sec.
> 432 and comment b to that section.  If the defendant's
> negligence is found to have been a substantial factor in
> causing the harm, the trier of fact may also consider
> evidence of the likelihood of success of proper treatment
> in determining the amount of damages to be awarded.

Id. at 763.

As these cases make clear, in jurisdictions that use a substantial factor test for causation, it is not necessary to recognize a loss of chance as a separate compensable injury. Nor is it necessary to abandon or adjust the substantial factor test for negligence in order to account for negligence by a medical professional that allegedly reduces a plaintiff's chance of survival.  Rather, the substantial factor test is adaptable enough to apply to such cases without any need to change traditional negligence rules.  Thus, we hold that, under Hawai'i law, "loss of chance" is not an independent cause of action, but is a relevant consideration in determining whether a defendant's negligence was a substantial factor in causing the plaintiff's injury.  In the words of the Supreme Court of Kansas:

> Considering the various approaches adopted by the
> courts, we are of the opinion that the middle ground or so-
> called relaxed causation standard of proof approach is the
> better rule.  In an action to recover for the loss of a
> chance to survive . . . , the plaintiff must first prove
> the traditional elements of a medical negligence action by
> a preponderance of the evidence.  The plaintiff must prove
> that the defendant was negligent in treating the patient,
> that the negligence caused harm to the plaintiff, and that
> as a result the plaintiff suffered damages.  In proving
> that the plaintiff suffered harm, the plaintiff must prove

32

> that the lost chance of survival . . . was a substantial
> loss of the chance.

Delaney, 873 P.2d at 185-86.

Although this case is the first in which we have fully considered the loss of chance doctrine under Hawai'i law, we note that Hawai'i courts, and federal courts applying Hawai'i law, have never recognized loss of chance as an independent and separately compensable cause of action.  Nor have they embraced a theory of legal causation other than the one articulated in Mitchell.

The earliest case addressing the loss of chance doctrine under Hawai'i law was McBride v. United States, in which the U.S. Court of Appeals for the Ninth Circuit applied Hawai'i law to a claim of medical negligence against a doctor at the Tripler Army Hospital.  462 F.2d at 73.  The Ninth Circuit held that the district court erred in holding that the plaintiff had failed to show the essential causal connection between a patient's nonadmittance to the hospital and his death.  Id. at 74.  With regard to the correct causal showing, the Ninth Circuit said:

> When a plaintiff's cause of action rests upon an allegedly negligent failure to give necessary treatment, he must show, with reasonable medical probability, that the treatment would have successfully prevented the patient's injury.  He need not prove with certainty that the injury would not have occurred after proper treatment.  In most situations the best medical treatment in the world cannot provide an absolute guarantee of success; medicine is not an exact science in that sense.  Yet the absence of

> positive certainty should not bar recovery if negligent
> failure to provide treatment deprives the patient of a
> significant improvement in his chances for recovery.  We
> think the plaintiff demonstrated the requisite reasonable
> medical probability in this case.

Id. at 75 (footnotes omitted).  We understand the Ninth

Circuit's holding to be that a plaintiff in a medical negligence

case is not required, as the plaintiff would be under the "all

or nothing" rule, to show with "positive certainty" that a

negligent act or omission caused an injury, only that a

reasonable finder of fact could conclude that it did.  Thus, the

holding in McBride was consistent with our substantial factor

causation rule.  See Futi, 2010 WL 2900328, at *26 (recognizing

that, although this court had not yet addressed the loss of

chance doctrine, "the Ninth Circuit interpreted [Hawai'i] law as

allowing the lost chance doctrine to apply to medical

malpractice claims").

Hawai'i courts have cited to McBride for the

proposition that medical opinions must be based on reasonable

medical probability.  See Craft, 78 Hawai'i at 305, 893 P.2d 138,

156; Barbee, 119 Hawai'i at 163, 194 P.3d at 1125.  The ICA in

Barbee also considered a loss of chance argument.  It held that,

because the plaintiffs had failed to provide expert medical

testimony, the circuit court had not erred in granting judgment

as a matter of law on that question to the defendants.  119

Hawai'i at 164, 194 P.3d at 1126.  However, it did not reject the

argument that the plaintiffs could have recovered for a loss of chance. It merely stated that the plaintiffs could not recover without the requisite expert testimony.

**B. The Claim Letter submitted by the Estate asserted a medical negligence claim that met the requirements of the MCCP statute.**

The MCCP—now MICP—statute requires a medical tort claimant to "submit a statement of the claim" before a suit can be commenced on the claim. HRS § 671-12(a) (1993). The statute sets three simple requirements for these claim statements: they must be submitted "in writing[,]" they must "set forth facts upon which the claim is based[,]" and they must "include the names of all parties against whom the claim is or may be made who are then known to the claimant." Id. These requirements are informal and undemanding, and the history of the MCCP process shows that they are intentionally so. The introduction of the MCCP process was "[a] significant aspect of the legislative effort to make the [medical malpractice] system less costly and more efficient[.]" Tobosa v. Owens, 69 Haw. 305, 312, 741 P.2d 1280, 1285 (1987). The process was designed "to encourage early settlement of claims and to weed out unmeritorious claims." Id. (quoting H. Stand. Comm. Rep. No. 417, in 1976 House Journal, at 1460). It is therefore unsurprising that the requirements to initiate a claim under HRS § 671-12 (1993) are designed to be simple. Cf. HRS § 671-13

(1993) (hearings are to be "informal"); HRS § 671-15 (1993) (MCCP decisions must be rendered within thirty days of a hearing); HRS § 671-19 (Supp. 1995) (parties and insurers are required to cooperate to achieve "a prompt, fair, and just disposition or settlement").[10]

The Claim Letter submitted by the Estate and the other Claimants met the requirements of the statute. It was in writing, identified Dr. Mastroianni as the party against whom the claim was being made, and contained a brief summary of the alleged facts underlying the claim. Nothing in the statute required the Claimants to lay out the legal theories that they would later pursue in the circuit court.

Under HRS § 671-1 (1993), a "[m]edical tort" is defined to include "professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to the patient." The Claim Letter alleged that Dr. Mastroianni was

_____

[10] Further emphasizing the informality of the MCCP process, the legislature renamed the panels Medical Inquiry and Conciliation Panels in 2012, based on its finding that "many claims now filed with medical claim conciliation panels tend to function as inquiries rather than actual claims, and patients or their families tend to use these proceedings to seek information regarding adverse events that they associate with medical treatment[,]" rather than to make "claims based on substantive analysis of the applicable standard of care." 2012 Haw. Sess. Laws Act 296, §1 at 1004-05. The legislature stated that the purpose of the MICP statute was "to more closely reflect actual practice and the original intent for panels to serve in a conciliatory function." Id. at 1006.

Frey's treating physician and that he discharged Frey after two days in the hospital with a diagnosis of bronchitis, despite indications that he had pneumonia.  It alleged that, after being discharged by Dr. Mastroianni, Frey had trouble breathing and was readmitted to the hospital, where his condition deteriorated until he died.  It identified specific acts or omissions of Dr. Mastroianni that allegedly fell beneath the standard of care, and alleged that "it is likely that [Frey] would have survived" if certain actions had been taken.  Thus, the Claim Letter set forth facts to support the Claimants' assertion that Dr. Mastroianni committed medical negligence or an error or omission in professional practice which was the legal cause of injury to, and ultimately the death of, Robert Frey.

The circuit court in this case held that it did not have jurisdiction over the loss of chance "claim" because the Estate had failed to raise it before the MCCP.  The ICA, based on its determination that a loss of chance is a separate compensable injury, agreed.  Estate of Frey, 2018 WL 3199216, at *7.  The circuit court and the ICA were correct that the requirements of the MCCP statute are "pre-condition[s]" and "jurisdictional prerequisites" to bringing a lawsuit.  Yamane v. Pohlson, 111 Hawai'i 74, 83, 137 P.3d 980, 989 (2006) (quoting Tobosa, 69 Haw. at 314, 741 P.2d at 1287) (citing Garcia v. Kaiser Found. Hosps., 90 Hawai'i 425, 441, 978 P.2d 863, 879

(1999)); see Dubin, 89 Hawai'i at 195, 970 P.2d at 503. The circuit court would not have had jurisdiction if the Estate had not complied with the MCCP procedures set out in Part II of HRS Chapter 671. However, as explained above, loss of chance is not a distinct cause of action, but a factor that may be relevant in determining whether a defendant's negligence was a substantial factor in causing a plaintiff's harm. Therefore, the Estate was not required to specifically raise loss of chance, or any other legal theory, before the MCCP in order to later file suit on the claim, so long as it otherwise met the requirements of HRS § 671-12(a) (1993). It was sufficient for the Claimants to set out facts upon which their medical tort claim is based as required by HRS § 671-1 (1993).

**C. The circuit court erred in granting judgment as a matter of law to Dr. Mastroianni.**

A motion for judgment as a matter of law may be granted only when there is no evidence to support a jury verdict in favor of the non-moving party. Kawakami, 142 Hawai'i at 513, 421 P.3d at 1283. In this case, there was ample evidence to support a jury finding in favor of the Estate.

In a medical negligence claim, the plaintiff has the burden of establishing "a duty owed by the defendant to the plaintiff, a breach of that duty, and a causal relationship between the breach and the injury suffered." Barbee, 119 Hawai'i

at 158, 194 P.3d at 1120 (quoting Bernard v. Char, 79 Hawai'i 371, 377, 903 P.2d 676 (App. 1995)).  A medical negligence plaintiff is required to establish legal causation through the introduction of expert medical testimony, id., and such testimony must be "based on a 'reasonable medical probability[,]'" id. at 163, 194 P.3d at 1125 (quoting Craft, 78 Hawai'i at 305, 893 P.2d at 156).  As to wrongful death claims, the plaintiff has the burden of establishing that the death of one person was caused by "the wrongful act, neglect, or default" of another, HRS § 663-3 (Supp. 1997), which, in this case, would be "medical negligence."

The testimony of the Estate's expert witnesses, summarized at length above, provided ample evidence for a reasonable jury to conclude that Dr. Mastroianni's failures to meet the standard of care were a legal cause, or significant factor, of Frey's death to a reasonable degree of medical probability.  In particular, Dr. Schultz testified that if Frey had stayed in the hospital, he "would have received treatment that might have included things to help him survive until the antibiotics could take effect" and that if certain measures had been taken, "there is a significant chance that [Frey] could have done better than he eventually did."  He also testified that Frey's chance of survival would have improved "significantly" if he had stayed in the hospital and if the

39

steps that were taken to combat Frey's sepsis had been taken earlier. Dr. Smith testified that if Frey had remained in the hospital and if certain steps had been taken, those steps "would all ensure [Frey's] safety[,]" that there would have been "an advantage" to administering antibiotics to Frey in the hospital, and that Frey "would have responded much better" if he had been administered antibiotics sooner.

In spite of this evidence, the circuit court and the ICA both concluded that judgment as a matter of law was appropriate. This conclusion appears to have rested on the requirement that expert medical testimony in medical malpractice cases must be based on reasonable medical probability, as the circuit court found that none of the Estate's experts "opined to a reasonable degree of medical probability as to whether Mr. Frey would have survived had he not been discharged by Dr. Mastroianni."

Because "the causal link" between alleged acts of medical negligence and their specific results is often "not within the realm of 'common knowledge[,]'" a jury generally must rely on "expert medical testimony to determine whether and to what extent any alleged negligence" contributed to the alleged harm. Barbee, 119 Hawai'i at 161, 194 P.3d at 1123. But because causation in the medical field cannot always be determined with perfect accuracy, "expert testimony on causation must be based

on a 'reasonable medical probability[.]'" Id. at 163, 194 P.3d at 1125 (quoting Craft, 78 Hawai'i at 305, 893 P.2d at 156); see McBride, 462 F.2d at 75. This means that testimony that "[falls] short of providing the causal nexus" between alleged negligence and harm to the patient is insufficient as a matter of law. Barbee, 119 Hawai'i at 163, 194 P.3d at 1125. However, when testimony asserting such a causal nexus is provided, it falls to the jury to determine whether the party presenting the testimony has met its burden of proof. Dzurik v. Tamura, 44 Haw. 327, 329, 359 P.2d 164, 165 (1960) ("A case involving a medical issue . . . is no exception to the rule that, when there are conflicting inferences and conclusions, it is the function of the trier of facts to select the one which it considers most reasonable.")

In this case, the circuit court erred when it found that none of the Estate's experts "opined to a reasonable degree of medical probability as to whether Mr. Frey would have survived had he not been discharged by Dr. Mastroianni[,]" and the ICA repeated the error in holding that "the expert medical testimony fell short of providing a causal nexus between Dr. Mastroianni's alleged negligence and Frey's death." Estate of Frey, 2018 WL 3199216, at *9. To the contrary, a jury could have found that the testimony from these experts did establish causation to a reasonable degree of medical probability. The

"reasonable medical probability" requirement did not require the Estate's experts to present theories of medical causation with absolute certainty, but with enough certainty to, "in the jurors' eyes, rise to the requisite degree . . . to establish a medical probability." Craft, 78 Hawai'i at 305, 893 P.2d at 156. Unlike the testimony at issue in Barbee, the testimony of the Estate's experts in this case provided sufficient certainty about the effect of Dr. Mastroianni's actions that the jury could conclude that there was a causal nexus to establish a medical probability; it was not "left to speculate whether [Dr. Mastroianni's] action or inaction *might or could have* resulted in" Frey's death. See 119 Hawai'i at 163, 194 P.3d at 1125.

Furthermore, each of the Estate's expert witnesses expressly stated that his testimony was to a reasonable degree of medical probability. As we held in Dzurik, however, such an explicit statement is not necessary for a jury to consider whether a failure to meet the standard of care was, to a reasonable degree of medical probability, a legal cause, or significant factor, for an injury:

> When causation of the injury is a medical issue, . . . "[the] matter does not turn on the use of a particular form of words by the physicians in giving their testimony," since it is for the trier of facts, not the medical witnesses, to make a legal determination of the question of causation. Here, the failure of a medical witness to testify positively as to what was the cause of the injury, or his statement that the accident "might" be or "probably" was the cause of the injury, is merely a circumstance to be taken into consideration by the trier of facts.

42

44 Haw. at 330, 359 P.2d at 165-66 (quoting Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109 (1959)). Although explicit statements from experts that a failure to meet the standard of care was a legal cause or significant factor of an injury "based upon a reasonable degree of medical probability" are frequently elicited in medical negligence cases, our holding in Dzurik that such express language is not necessary remains good law.

Neither Barbee nor Craft require that a medical expert explicitly state that causation exists to a reasonable degree of medical probability. In Barbee, medical experts testified that the deceased's condition was "ongoing and progressive" and that "a hemoglobin of three indicates 'severe anemia, likely incompatible with life[.]'" 119 Hawai'i at 163, 194 P.3d at 1125. The ICA found that the expert testimony established, at most, that it was possible "[d]efendants' 'action or inaction *might or could have*' resulted" in causing Barbee's death, and thus left the jury to speculate. Id. (quoting Wicklund v. Handoyo, 181 S.W.3d 143, 149 (Mo. Ct. App. 2005)). In Craft, this court stated that the medical testimony of Craft's experts introduced new theories of medical causation not sufficiently tested, and thus the jury was appropriately instructed to disregard any medical opinion that was not based upon reasonable

medical probabilities.  <u>Craft</u>, 78 Hawai'i at 305, 893 P.2d at 156.

Thus, in determining whether a medical expert's statement is to a reasonable degree of medical probability, we look not to whether the medical expert made an explicit statement characterizing their testimony as "to a reasonable degree of medical probability" but rather, to the evidence itself.  In this case, sufficient expert testimony existed in the record for the jury to consider the issue of causation.  The ICA therefore erred in ruling that Frey failed to present any expert medical testimony establishing that Dr. Mastroianni caused Frey's death "to a reasonable degree of medical probability".

## IV.  CONCLUSION

For the foregoing reasons, the ICA's memorandum opinion and judgment on appeal are vacated, the circuit court's judgment in favor of Dr. Mastroianni is vacated, and the case is remanded to the circuit court for a new trial consistent with this opinion.

Anthony L. Ranken
Samuel P. Shnider
for Petitioner

Thomas E. Cook
Brandford F.K. Bliss
for Respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

